**Robert JOHNSON and Juanita Johnson, Appellees,**

v.

**INTERNATIONAL HARVESTER COMPANY, Appellant.**

**No. 82–1201.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 12, 1983.

Decided March 24, 1983.

Edward S. Digges, Jr., Baltimore, Md. (Robert Dale Klein, Baltimore, Md., Seymour W. Croft, Charles J. Lawson, Chicago, Ill., Piper & Marbury, Baltimore, Md., on brief), for appellant.

Perry A. Hilbert, Jr. and Allan Sosslau, Silver Spring, Md., for appellees.

Before HALL, MURNAGHAN and SPROUSE, Circuit Judges.

K.K. HALL, Circuit Judge:

International Harvester (IH) appeals from a judgment entered on a jury verdict for Robert and Juanita Johnson (Johnsons) in their suit alleging defective design and placement of the transmission control levers on a 1973 Model 2400A tractor. IH's main contention on appeal is that the Johnsons failed to present sufficient evidence to permit a jury to consider purported defects in the design of this tractor, and further, that they failed to present sufficient evidence that any alternative tractor design would have been technologically and economically feasible, marketable and safer. We disagree, and affirm the judgment below.

## I.

In 1963, IH decided to produce a standardized "worldwide tractor" which could be marketed both in the United States and internationally. The Model 2400A "Lo-Boy" tractor was designed to meet this worldwide concept. It was intended for light industrial and landscaping use. Unlike all other tractors, which employed a "straddle type" transmission control, that placed the range and speed levers between the operator's legs beneath the steering wheel, the "Lo-Boy" tractor mounted the levers on a console to the left of the operator's seat.

The General Services Administration (GSA) at the Department of Energy complex in Germantown, Maryland, purchased a Model 2400A tractor in June, 1973, and added a cab and heater to the tractor to protect the operator from the elements. The cab entirely closed off the right exit of the tractor while the heater box was placed in the front left-side of the cab.

On October 14, 1977, Johnson, a gardener for GSA, had been trimming shrubbery and using the tractor to carry his tools and haul the trimmings. His supervisor instructed him to return the tractor to the GSA equipment shed so that the radiator could be flushed and fresh antifreeze added. Mr. Johnson drove the tractor back to the equipment shed's asphalt apron, parked it, shut off the engine, and exited from the tractor.

While Johnson put his tools away, the old anti-freeze solution was flushed from the tractor's radiator onto the asphalt pavement. His supervisor then asked Johnson to start the engine in order to circulate the new anti-freeze which had been added. Johnson testified that he climbed back into the tractor, sat in the operator's seat and started the engine. He further testified

that as he was exiting the tractor, with the engine still running, his feet suddenly slid out from under him and he fell onto the ground in front of the left rear wheel. The tractor began to move forward and rolled over him, severely crushing him from his left foot diagonally across his body to his right shoulder. The parties stipulated that immediately after the accident, the transmission lever was found in the forward gear.

Johnson and his wife filed this action against IH. They asserted that the placement of the range lever so that it protruded into the left opening of the tractor, without provisions to prevent the lever from accidentally moving into gear, constituted a defective design which was unreasonably dangerous to the operator. They claimed damages under theories of both strict liability and negligence.

At trial, before a jury, Johnson's sole expert witness was Stephen J. Chris, a registered professional mechanical and safety engineer with a degree in aeronautical engineering. He testified that upon examination of the tractor he found that the range lever protruded into the exitway and that this machine could be moved into gear while the engine was running, without the use of the clutch. Further, Chris stated that there was no handle to assist a person in getting in or out of the tractor. To avoid these problems which in his opinion were unreasonably dangerous, Chris advanced several theories of alternative design which he believed would have made this tractor safer than the design used by IH.

IH's expert witnesses were James W. Zurek and Richard G. Hennessey, mechanical engineers and managers of departments within IH. Zurek testified that after the accident he found that the transmission on the tractor in question was operating properly and that it was possible to put the tractor into gear without using the clutch.

Hennessey, IH's second expert witness, contradicted Chris' testimony and opined that the proposed design changes suggested by Chris were not practical or sensible and further, would not have prevented Johnson's accident.

The jury returned a verdict for the Johnsons in the amount of $400,000. IH moved for judgment notwithstanding the verdict, or alternatively, for a new trial. Both motions were denied. From the judgment entered upon the jury verdict and the denial of its post-trial motions, IH appeals.

## II.

In *Singleton v. International Harvester Co.,* 685 F.2d 112 (4th Cir.1981), this Court analyzed, under Maryland's product liability law, a design defect case very similar to the case at bar. As in *Singleton,* the instant case must be resolved under the law of Maryland, which adopted strict tort liability in *Phipps v. General Motors Corp.,* 278 Md. 337, 363 A.2d 955 (1976). In *Singleton,* we held that, "In a design defect case the issue is whether a manufacturer, knowing the risks inherent in his product, acted reasonably in putting it on the market." *Id.* at 115. Further, we noted that the plaintiff must produce evidence upon which a jury could determine the manufacturer's reasonableness in marketing the product, and that this must amount to more than mere criticism of the existing design. To determine the reasonable safety of the product, we concluded that the following factors must be considered:

(1) the usefulness and desirability of the product, (2) the availability of other and safer products to meet the same need, (3) the likelihood of injury and its probable seriousness, (4) the obviousness of the danger, (5) common knowledge and normal public expectation of the danger (particularly for established products), (6) the avoidability of injury by care in use of the product and (7) the ability to eliminate danger without seriously impairing

the usefulness of the product or making it unduly expensive. *Citing Phipps v. General Motors Corp., supra.*

The Johnsons produced evidence showing that IH departed from the standard industry design by placing the transmission lever in the exitway on the left side of the operator's seat instead of in the "straddle type" position used by the rest of the industry. Furthermore, it is clear from the record that IH knew that tractor operators would be dismounting from the tractor with the engines running to service this machine. This is evidenced by its operator's manual which contained several suggestions for maintenance which could not be completed from the operator's seat and were required to be performed with the engine running. In addition, there were several pieces of machinery, such as grain grinders, water pumps and generators, which were to be powered by the tractor while it remained in a stationary position. Despite this knowledge, IH still chose to place the transmission control levers in the exitway and failed to incorporate any safety mechanism to prevent the tractor from accidentally being moved into gear.

Moreover, Chris, Johnson's expert witness, testified that the transmission control lever design of the Model 2400A tractor did not comport with the safety standards and recommended practices of the Society of Automobile Engineers (SAE) and the American Society of Agricultural Engineers (ASAE), which were applicable to this machine when it was manufactured. To remedy what Chris believed was the tractor's defective design, he advanced several theories of alternative design which would have made it safer.[1] His alternatives were:

(1) that the transmission lever should have remained on the transmission hump between the operator's legs and beneath the steering wheel where the industry had placed it for many years. The evidence showed that the side-mounted controls used by IH were more expensive to produce than the other style used by the rest of the industry.

(2) that even with the transmission lever located on the left side of the operator it could have been removed from the exitway by merely moving the axis on which it rotated three inches rearward from its existing position. Chris testified that the same material would be used and only a few inches more would be required, thereby increasing the cost only slightly. Further, Chris opined that although this change would result in a small sacrifice in operator comfort, the controls would still remain within the maximum safety area provided by the SAE and ASAE standards.

(3) that the angle of the transmission lever itself could be bent rearward a few degrees, which would prevent its protrusion into the exitway while in a neutral position. According to Chris, this would incur no additional material or costs.

(4) that a mechanical lock could have been incorporated into the gear shift lever to hold it in a neutral position and prevent it from being accidentally moved into gear. Chris testified that a locking device would not interfere with the operation of the tractor and would only cost from one to five dollars for all of the needed materials. IH conceded that the technology to build a locking mechanism was available and would have been a simple design to incorporate.

(5) that a handhold could have been incorporated on the left rear fender to facilitate entry and exit. IH again conceded that such handholds were technologically feasible in 1973 when this tractor was produced. Again the evidence showed the cost would be small.

(6) that the warning on the tractor could have more accurately notified the operator of the danger of dismounting while the engine was running. Johnson testified that he was not aware of the danger in exiting

1. The district court directed a verdict in favor of IH regarding two of Chris' alternative design theories; therefore, they are not before this Court on appeal.

from the tractor with the engine running. Although the Johnsons presented no other evidence concerning the adequacy of the warnings, the jury could infer from Johnson's testimony that the warning provided was insufficient.

In *Wilson v. Piper Aircraft Corp.*, 282 Or. 61, 577 P.2d 1322, *aff'd on rehearing*, 282 Or. 411, 579 P.2d 1287 (1978), the Supreme Court of Oregon ruled that in defective design cases involving uncomplicated products or simple design features, the question of the practicability of a proposed design change could be weighed on the basis of inference and common knowledge of the jury. We agree with this reasoning. In the present case, all the proposed alternative designs suggested by Chris were relatively simple ideas from which a jury, using common sense and everyday knowledge, could infer that the changes would not significantly affect the overall engineering of the tractor or be unduly expensive.

Therefore, after carefully reviewing the entire record, we find that the Johnsons did produce sufficient evidence upon which a jury could find that IH produced an unreasonably dangerous product and that a safer tractor design was technologically feasible, less costly to produce and was more practicable in terms of overall design and operation.

### III.

We find that the other issues raised by IH on appeal are without merit. Accordingly, we affirm the judgment of the district court.

*AFFIRMED.*