537 A.2d 622

**VALK MANUFACTURING COMPANY**

v.

**Radha RANGASWAMY, et al.**

**No. 156, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

March 2, 1988.

Certiorari Granted June 24, 1988.

306

Hugh E. Donovan (Daniel W. O'Connell and Donovan & Nash, on the brief), Silver Spring, for appellant.

John G. Gill, Jr. (Cynthia A. Raposo and Gill & Sippel, on the brief), Rockville, for appellees, Rangaswamy et al.

Clyde Henning, Associate Co. Atty. (Paul A. McGuckian, Co. Atty. and Joann Robertson, Sr. Asst. Co. Atty., on the brief), Rockville, for appellee, Montgomery County.

Argued before MOYLAN, BISHOP and GARRITY, JJ.

MOYLAN, Judge.

The fatal collision giving rise to this litigation occurred on December 19, 1982. Dr. Srinivasa Rangaswamy, driving a Toyota automobile, attempted to exit from his housing development at West Kersey Lane in Montgomery County onto Falls Road. The intersection was controlled by a stop sign. A C & P Telephone Company truck was parked near the intersection at its northeast quadrant. The location of the truck was such that it inhibited the view of westbound traffic on Falls Road to motorists attempting to enter onto Falls Road from West Kersey Lane.

The Rangaswamy Toyota pulled up to the intersection of Falls Road and came to a stop. Prior to entering Falls Road, Dr. Rangaswamy purportedly looked both left and right. He then accelerated into the intersection directly into the path of a dump truck owned by Montgomery County. The vehicles collided.

At the time of the collision, the Montgomery County dump truck had a snowplow hitch mounted on its front. No snowplow was attached to the hitch, however. The hitch contained a steel lift arm measuring 20 inches in length. The lift arm projected 29 inches beyond the radiator and bumper of the truck. Movement of the lift arm was controlled by a hydraulic cylinder held in place by two 3-inch cotter pins. By removing the lower cotter pin, the lift arm would drop to a flush position.

When the vehicles collided, the lift arm protruded inside the Rangaswamy vehicle as the full force of the moving dump truck struck the left side of the Toyota at the driver's door. Shortly thereafter, Dr. Rangaswamy died of multiple injuries to the head and chest.

The appellees, Radha Rangaswamy (widow of Dr. Rangaswamy) and her minor child Arum Rangaswamy, brought this action for the wrongful death of Srinivasa Rangaswamy. The appellees filed suit against several different parties. Two defendants, C & P Telephone Company and Montgomery County, were sued under theories of negligence. A third defendant, Valk Manufacturing Company, the appellant here, was sued under theories of negligence and strict liability in tort. Valk was the manufacturer of the snowplow hitch which was attached to the Montgomery County dump truck. Valk, in turn, filed a cross-claim against Montgomery County.

Prior to trial, the appellees settled their case against C & P Telephone Company. The appellees received $250,000 in exchange for giving the telephone company a joint tort-feasors release. The appellees' case against the County and Valk Manufacturing went forward. At the conclusion of the appellees' case-in-chief, a motion for judgment was granted in favor of Montgomery County. A motion for judgment was also granted in favor of the County on the cross-claim of Valk Manufacturing. The trial judge ruled that the deceased was contributorily negligent as a matter of law. The case proceeded to the jury on the strict liability count against Valk Manufacturing, at that point the sole remaining defendant. A jury verdict in the amount of $2,500,000 was returned against Valk. Valk's motion for judgment notwithstanding the verdict or, in the alternative, a motion for new trial was denied.

Upon this appeal, Valk raises the following five contentions:

1) That the trial court erred in failing to grant appellant's motion for judgment and/or motion for judgment notwithstanding the verdict where appellees failed to

make a *prima facie* showing of liability under the doctrine of strict liability as applied in Maryland;

2) That the trial court erred in failing to grant appellant's motion for judgment and/or motion for judgment notwithstanding the verdict where the evidence established the deceased's assumption of the risk as a matter of law;

3) That the trial court erred in failing to grant appellant's motion for judgment and/or motion for judgment notwithstanding the verdict where the appellees failed to establish, as a matter of law, that the alleged defect was the cause of death;

4) That the trial court committed prejudicial error by allowing the improper and irrelevant testimony of Dr. William Belmont on the economic loss to the deceased's corporation; and

5) That the trial court erred in granting Montgomery County's motion for judgment on the cross-claim of Valk.

The first four issues raised by the appellant, Valk, concern only the appellees, the Rangaswamys. The fifth issue concerns only the appellee, Montgomery County. We shall consider first appellant's claims concerning the Rangaswamys and then address the issue concerning Montgomery County.

## Standard of Appellate Review

The appellant's first three contentions charge that Judge Richard B. Latham, before whom this case was heard in the Circuit Court for Montgomery County, erroneously denied its motions for judgment and/or judgment notwithstanding the verdict on three separate grounds. In approaching these claims, we are, of course, required to resolve all conflicts in the evidence in favor of the plaintiff, to assume the truth of all credible evidence presented in support of the plaintiff, and to accept as true all inferences naturally and legitimately arising from the evidence which tend to support the plaintiff's right to recover. *James Gibbons Co. v.*

*Hess*, 44 Md.App. 216, 407 A.2d 782 (1979); *Battista v. Savings Bank of Baltimore*, 67 Md.App. 257, 507 A.2d 203 (1986). If there is competent evidence, however slight, to support the plaintiff's right to recover, the motion for judgment and/or motion for judgment n.o.v. should be denied. *Keene v. Arlan's Dept. Store of Baltimore, Inc.*, 35 Md.App. 250, 370 A.2d 124 (1977).

### Strict Liability in Tort

In the rapidly developing and still fluid field of products liability law, there are now three alternative theories under which a claimant may seek damages against the manufacturer or seller of a defective product:

> "This now means that a claimant seeking damages against a merchant seller has three alternative theories available, all of which are often utilized in the same case. These are: (a) negligence in tort, (b) strict liability for breach of warranty, express or implied, and (c) strict liability in tort."

W. Keeton, *Prosser and Keeton on Torts* 694 (5th ed. 1984). The newest of these theories is strict liability in tort. It was first applied in California in 1963 in the seminal case of *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963). A year later, the final acceptance of § 402A of the *Restatement (Second) of Torts* placed the imprimatur of the American Law Institute on the notion of strict liability in tort. By 1984, nearly every state had adopted some version of § 402A. W Keeton, *supra*, at 694. Maryland adopted the theory of strict liability in tort in 1976, in the case of *Phipps v. General Motors Corporation*, 278 Md. 337, 363 A.2d 955 (1976). Judge Eldridge, in a thorough and scholarly opinion for the Court of Appeals, traced the historic development of the strict liability in tort theory for products liability cases. He discussed as well the evolving philosophy undergirding recent changes in tort theory.

Section 402A, as now adopted by Maryland, provides:

"Special liability of Seller of Product for Physical Harm to User or Consumer

'(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.'

(2) The rule stated in Subsection (1) applies although

'(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.' "

*Restatement (Second) of Torts* § 402A (1965).

An appreciation of the significant change that has taken place in recent decades in the undergirding philosophy of tort law with respect to products liability will help to liberate us from earlier limiting notions such as 1) some duty of care on the part of the manufacturer/seller (a heavy factor under contractual theories of liability based on express or implied warranties as well as in negligence law) and 2) the necessity for some sort of moral fault or blame in the manufacturer/seller (a dominant factor in 19th Century tort law). Strict liability in tort is today largely a societal decision that the cost of injury should be borne by those best able to bear such costs. As Judge Eldridge explained, in *Phipps v. General Motors,* at 278 Md. 343, 363 A.2d 955:

"Various justifications for imposing strict liability in tort on manufacturers have been advanced by the courts. It has been said that the cost of injuries caused by defective products should in equity be 'borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to

protect themselves' and that 'warranties serve this purpose fitfully at best.' *Greenman v. Yuba Power Products, Inc., supra* [59 Cal.2d 57, 27 Cal.Rptr. 697] 377 P.2d [897] at 901 [1963]. It has also been suggested that imposing strict liability on manufacturers for defective products is equitable because it shifts the risk of loss to those better able financially to bear the loss. *Seely v. White Motor Company,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145, 151 (1965). Another reason advanced is that a consumer relies upon the seller in expecting that a product is safe for the uses for which it has been marketed, and that this expectation is better fulfilled by the theory of strict liability than traditional negligence or warranty theories. *Markle v. Mulholland's, Inc.,* 265 Or. 259, 509 P.2d 529, 532–534 (1973). And still another reason advanced is that the requirement of proof of a defect rendering a product unreasonably dangerous is a sufficient showing of fault on the part of the seller to impose liability without placing an often impossible burden on the plaintiff of proving specific acts of negligence. *McCormack v. Hankscraft Company,* 278 Minn. 322, 154 N.W. 2d 488, 500 (1967); *Dippel v. Sciano,* 37 Wis.2d 443, 155 N.W.2d 55, 63 (1967)." (Footnote omitted).

■ In order for a plaintiff to recover under this theory of strict liability in tort, he must establish: 1) that the product was in a defective condition at the time it left the possession or control of the seller; 2) that it was unreasonably dangerous to the user or consumer; 3) that the defect was the cause of the injuries; and 4) that the product was expected to and did reach the consumer without substantial change in its condition. *Kelley v. R.G. Industries, Inc.,* 304 Md. 124, 497 A.2d 1143 (1985). *See also Ellsworth v. Sherne Lingerie, Inc.,* 303 Md. 581, 495 A.2d 348 (1985); *Sheehan v. Anthony Pools,* 50 Md.App. 614, 440 A.2d 1085 (1982), *aff'd,* 295 Md. 285, 455 A.2d 434 (1983). The focus in a strict liability case is on the product rather than the manufacturer. As such, the critical inquiry is whether,

indeed, the product is defective. *Phipps,* 278 Md. at 344, 363 A.2d 955.

As W. Keeton, *supra,* points out, at 695, a product may be defective within the contemplation of strict liability in tort in any of three separate ways:

"A product is defective as marketed in the kind of way that makes it unreasonably dangerous for any of the following reasons: (1) a flaw in the product that was present in the product at the time the defendant sold it; (2) a failure by the producer or assembler of a product adequately to warn of a risk or hazard related to the way the product was designed; or (3) a defective design."

It is the third of those ways, a defective design, that concerns us in this case.

*Design Defect:*

*The Risk–Utility Test*

■ As W. Keeton, *supra,* again points out, at 698, "there are essentially two different approaches that have been utilized in evaluating design hazards—a consumer-purchaser or consumer-user contemplation test and a risk-utility test." It is the second of these tests that was utilized in the present case.[1] Under the risk-utility test:

"Under this approach, a product is defective as designed if, but only if, the magnitude of the danger outweighs the utility of the product. The theory underlying this approach is that virtually all products have both risks and benefits and that there is no way to go about evaluating design hazards intelligently without weighing danger against utility. There have been somewhat different ways of articulating this ultimate standard or test. But in essence, the danger-utility test directs attention of

---

1. On appeal, Valk raised the consumer-user contemplation test. This line of argument comes too late. The jury was not instructed on this test. Valk requested no such instruction. Nor was it argued to the jury. Since this point was neither raised nor decided below, we shall not consider it. Md. Rule 1085.

attorneys, trial judges, and juries to the necessity for weighing the danger-in-fact of a particular feature of a product against its utility. Under this test, a product can be said to be defective in the kind of way that makes it 'unreasonably dangerous' if a reasonable person would conclude that the danger-in-fact, whether foreseeable or not, outweighs the utility of the product." (Footnote omitted).

*Id.* at 699. Under the risk-utility test, a product is defective as designed if the risk or danger of the product outweighs the product's utility. *Simpson v. Standard Container Co.,* 72 Md.App. 199, 527 A.2d 1337 (1987). The key to applying the test is the weighing or balancing of competing interests. This Court applied the risk-utility test in *Troja v. Black & Decker Mfg. Co.,* 62 Md.App. 101, 488 A.2d 516 (1985). Chief Judge Gilbert there discussed the weighing or balancing process and the factors that entered therein, at 62 Md.App. 107–108, 488 A.2d 516:

"Section 402A requires a court, in a design defect case, to weigh 'the utility of risk inherent in the design against the magnitude of the risk.' *Phipps v. General Motors Corp.,* 278 Md. at 345, 363 A.2d at 959. The court, *Phipps* tells us, ought to implement a balancing process to decide whether the product in question was unreasonably dangerous.

One helpful guide to the balancing process was recommended in Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss.L.J. 825, 837–38 (1973). Wade suggests seven factors that should be weighed in determining whether a given product is 'reasonably safe.' Those factors are:

'(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.'

*See also Phipps v. General Motors Corp.*, 278 Md. at 345, n. 4, 363 A.2d at 959, n. 4."

The issue to consider is whether a manufacturer, knowing the risks inherent in his product, acted reasonably in putting it on the market. *Singleton v. International Harvester Co.*, 685 F.2d 112 (4th Cir.1981). *See also Johnson v. International Harvester Co.*, 702 F.2d 492 (4th Cir.1983); *Banks v. Iron Hustler Corp.*, 59 Md.App. 408, 475 A.2d 1243 (1984).

■ In the instant case, the record reveals the following facts and rational inferences deducible therefrom concerning the reasonableness of appellant's action in placing the product in question, the snowplow hitch, upon the market. The hitch in question contained a lift arm, made of steel, which measured 20 inches in length. The lift arm was designed so that it protruded 29 inches from the front of the dump truck owned by Montgomery County. The County's mechanical engineer, who qualified as an expert in the field of safety engineering, testified that the design of the hitch was unreasonably dangerous. His opinion was bottomed on the reasoning that if involved in a collision, the hitch would only serve to magnify the resulting damage or injury. There was further testimony to the effect that the

protruding hitch served no practical purpose when not pushing a snowplow blade.

Valk, to be sure, presented a persuasive case that the reason that the steel lift arm was protruding from the front of the truck at the time of the accident was not because of any design defect, but rather because of the failure of Montgomery County to utilize the safety features that were readily available. According to Valk's expert, the lift arm had the capability of being lowered to a position which would make it flush with the front of the truck. The movement of the lift arm was controlled by a hydraulic cylinder, which was held in place by two three-inch cotter pins. By simply removing the lower cotter pin, the lift arm would drop to a flush position. The expert testified that this lower cotter pin could be removed in less than one minute.

In response to the argument that the lift arm thus lowered and the hydraulic cylinder with one cotter pin removed might be loose and unstable appurtenances on the front of a moving truck, the expert pointed out that in approximately two minutes, one could easily remove the entire hydraulic cylinder itself simply by using an open-end wrench and a pair of pliers. The failure to take either of these available safety measures, Valk argued, constituted a misuse of the product rather than a flaw in its initial design.

The flaw in Valk's own argument is that although this was a very persuasive case, it failed to persuade. It was not so overwhelming and decisive as to preclude, as a matter of law, a finding in the opposite direction based upon the appellees' evidence.

Without immersing ourselves too deeply in the world of mechanics, a world in which we frankly acknowledge little or no competence, we glean from the record the counter-argument which a jury could also have gleaned from the record. Valk had been in the business of making snowplows, frames, and hitches since 1960. It was one of eight recognized manufacturers of snowplows on a national level. The expert for the appellees testified that there is in the

trade a hitching feature known as a "quick disconnect hose." The "quick disconnect hose" facilitates the removal of the hydraulic cylinder and the lift arm without any attendant ill consequences. Without a "quick disconnect hose," the hydraulic fluid in the cylinder (or, at the very least, in the hose) would drain out whenever the disconnecting operation was utilized. This would entail 1) an unpleasant mess at the spot where the truck had been sitting and 2) a more frequent necessity to refill the cylinder with hydraulic fluid with its attendant inconvenience and increased risk that sometimes the necessary refilling would be overlooked.

Valk's response, in appellate brief, is that the design question of "quick disconnect hose" versus the absence of a "quick disconnect hose" is not a design feature that goes directly to the consideration of safety. That may be correct, but it ignores the fact that a design flaw, if there be one, could have an indirect rather than a direct influence on safety. If the absence of the "quick disconnect hose" makes the utilization of the available safety features more vexing and more costly, it thereby makes it less likely that the safety feature will be utilized. The appellant's expert, moreover, testified that the additional cost of a "quick disconnect hose" would be approximately $7.00. The feature is very common in the trade generally and has actually been utilized by Valk itself in its sales of hitches within the State of Ohio.

This evidence, we think, was minimally sufficient to create a triable issue of fact and as such was properly submitted to the jury. The determination of the weight of that evidence is the responsibility of the jury.

### Strict Liability In Tort: Coverage of the "Bystander"

The appellant also claims that the appellees' right to recovery founders upon the all-important concept of legal duty. The appellant points out that § 402A of the *Restatement (Second) of Torts* (1965) gives a right of recovery for injuries caused by unreasonably dangerous products to

users and consumers of those products. A "consumer" is defined as one who purchases a product or who is a member of the family of the final purchaser, his employee, a guest at his table, or a donee of the purchaser. *Restatement (Second) of Torts*, § 402A comment 1 (1965). "Users" are categorized as those who passively enjoy the benefit of the product. *Id.* The appellees' decedent, Srinivasa Rangaswamy, fits into neither class of potential plaintiffs given the right of recovery against manufacturers of a defective product, asserts the appellant. Therefore, appellant concludes, the appellees' recovery under § 402A is barred.

The appellees argue and Judge Latham ruled that even a third-party beneficiary or "bystander" is now covered under strict liability in tort. This is an issue of first impression in Maryland. We affirm the ruling of Judge Latham in this regard.

The unmistakable movement over recent decades has been toward vastly expanded coverage in the products liability field. Within each of its doctrinal subdivisions—1) the original contractual obligation based upon express and implied warranties, 2) the subsequently developed liability in tort for negligence, and 3) the final development of strict liability in tort—there has been internal movement as well, although the chronology for that internal movement has been slower in the more recently developed doctrinal area. Originally, there was coverage only for the immediate purchasers who were in privity with the manufacturers/sellers. That coverage was soon expanded to include even more remote consumers and ultimately users. The last and most recent expansion has embraced third-party beneficiaries or bystanders as well.

The expansion came first with respect to negligence in tort. In the famous case of *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916), Judge Cardozo reasoned that the manufacturer, by placing the car upon the market, assumed a responsibility to the ultimate consumer, resting not upon the contract but upon the relation arising from the purchase, together with the foreseeability

of harm if proper care were not used. "The rule that has finally emerged is that the seller is liable for negligence in the manufacture or sale of any product which may reasonably be expected to be capable of inflicting substantial harm if it is defective." W. Keeton, *supra,* at 683.

With respect to the coverage of remote consumers and users, strict liability, first based upon a warranty theory, followed after such expanded coverage based upon negligence in tort:

"With the liability of the seller of chattels to the ultimate consumer once established on the basis of negligence, it was to be expected that some attempt would be made to carry his responsibility even further, and to find some ground of strict liability which would make the seller in effect an insurer of the safety of the product, even though he had exercised all reasonable care and even when there was no privity of contract between the victim and the target defendant. The first case—on the heels of a prolonged agitation over food and drink—which discarded the requirement of privity of contract was *Mazetti v. Armour & Co.* [75 Wash. 622, 135 P. 633] in Washington in 1913. It was followed, rapidly and then slowly, over almost half a century, by other courts which found strict liability as to defective food and drink, until by 1960 the majority of American courts had made it an established rule. The movement ran considerably ahead of any legal justification to support it." (Footnotes omitted).

*Id.* at 690.

In the years that followed the *MacPherson* decision, the coverage for negligence in tort continued to expand until it ultimately embraced mere bystanders as well:

"The *MacPherson* decision did not carry the liability of the seller for negligence beyond the ultimate purchaser himself. It was, however, soon expanded to other users and consumers of the product, and then to those who were 'in the vicinity of the chattel's probable use,' or, as it is now put by the *Second Restatement,* 'those whom he should expect to be endangered by its probable use.'

There is no longer any doubt that the negligence liability extends to any lawful user of the thing supplied, as well as to a mere bystander, or a pedestrian in the path of a car. For negligence, in other words, there is liability to any foreseeable plaintiff." (Footnotes omitted).

*Id.* at 703.

Once the expanded coverage became a *fait accompli* with respect to negligence in tort, the next and final arena became that of strict liability:

"The existence of a contract with the buyer of course does not prevent the existence of a tort duty to a third person who will be affected by the seller's conduct. The battle over liability for negligence has been fought and won by the plaintiff, both in England and in the United States, and the scene of combat shifted in the 1960's to the field of strict liability." (Footnotes omitted).

*Id.* at 682.

Valk points out that by its express terms, § 402A of *Restatement (Second)* applies only to users and consumers and not to bystanders. That is correct, as far as it goes. What it conveniently neglects to mention is that the writers of the *Restatement,* in comment o, have expressed "neither approval nor disapproval" of the extension of strict liability to permit recovery by bystanders. Comment o reads, in pertinent part:

"Casual bystanders, and others who may come in contact with the product, as in the case of employees of the retailer, or a passerby injured by an exploding bottle, or a pedestrian hit by an automobile, have been denied recovery. There may be no essential reason why such plaintiffs should not be brought within the scope of the protection afforded, other than that they do not have the same reasons for expecting such protection as the consumer who buys a marketed product; but the social pressure which has been largely responsible for the development of the rule stated has been a consumer's pressure, and there is not the same demand for the protection of casual strangers. The Institute expresses neither ap-

proval nor disapproval of expansion of the rule to permit recovery by such persons."

Indeed, § 402A, in its earlier comment c, sets forth the general policies underlying the strict liability concept, which general policies seem to argue for expansion of the coverage. Section 402A is premised upon the assumption that a seller assumes a special responsibility to the public; that the public has a right to expect reputable sellers to stand behind their products; that public policy demands the costs of injuries due to defective products be placed on those who market them; and that such injuries are properly treated as a cost of production and insurable risks by those in the best position to seek such protection. Jurisdictions extending liability to the "bystander" point to these general policies as ample justification.

As W. Keeton, *supra*, points out, at 703, it was, "perhaps because the early decisions were grounded on a theory of warranty [that] the strict liability of the seller was at first limited to 'users' or 'consumers' of the product." The break away from the limitation came in 1965, when the Michigan Supreme Court extended the strict liability of a seller of a shotgun to a bystander who was injured. *Piercefield v. Remington Arms Co.*, 375 Mich. 85, 133 N.W.2d 129 (1965).

Perhaps the most influential case allowing nonusers and nonconsumers to recover is *Elmore v. American Motors Corp.*, 70 Cal.2d 578, 75 Cal.Rptr. 652, 451 P.2d 84, 33 A.L.R.3d 406 (1969). In that case, the plaintiff's car malfunctioned and plaintiff crossed the roadway and struck a second plaintiff's car. The lower court sustained nonsuits on behalf of the manufacturer and the retailer. The California Supreme Court reversed, basing its holding on the general policy grounds that manufacturers should bear the cost of injuries caused by their defective products. The court pointed out that injury to a bystander is often foreseeable and that restrictions of the doctrine to users and consumers rests on what is but a vestige of the disappearing privity requirement. 70 Cal.2d at 586, 75 Cal.Rptr. at 657, 481 P.2d at 89, 33 A.L.R.3d at 413.

The court in *Ciampichini v. Ring Bros., Inc.,* 40 A.D.2d 289, 339 N.Y.S.2d 716 (1973), without hesitation overruled a prior decision denying "bystander" recovery and emphatically stated:

> "We resolve that issue now by laying to rest a principle which we believe outmoded and no longer adaptable to the rights of individuals in contemporary society."

339 N.Y.S.2d at 717. "Bystander" recovery, on a strict liability theory, was also approved in *Weber v. Fidelity Cas. Ins. Co.,* 259 La. 599, 250 So.2d 754 (1971). In *Embs v. Pepsi–Cola Bottling Co.,* 528 S.W.2d 703 (1975), the Kentucky court extended liability to a bystander whose injuries were reasonably foreseeable, and held that recovery was allowed against middlemen, as well as manufacturers. *Embs* also noted that "once strict liability is accepted, bystander recovery is *fait accompli.*" 528 S.W.2d at 705.

In *West v. Caterpillar Tractor Co., Inc.,* 336 So.2d 80 (Fla.1976), the plaintiff was crossing the street when she was run over by a Caterpillar tractor driven by a contractor's employee. The Fifth Circuit Court of Appeals certified the issue of "bystander" recovery to the Florida Supreme Court. The Florida court noted that no adequate rationale or theoretical explanation existed to deny the benefits of the strict liability doctrine to bystanders.

Most jurisdictions, when called upon to do so, have extended the strict liability doctrine to provide relief to bystanders.[2] *See Caruth v. Mariani,* 11 Ariz.App. 188, 463 P.2d 83 (1970); *Davis v. Gibson Products Co.,* 505 S.W.2d 682 (Tex.1973); *Darryl v. Ford Motor Co.,* 440 S.W.2d 630

---

**2.** *Davidson v. Leadingham,* 294 F.Supp. 155 (E.D.Ky.1968), appears to be the only decision adopting strict liability but limiting recovery to users and consumers. This is the only authority cited by Valk for declining to extend strict liability coverage to bystanders. It is to be noted that the decision in the case came before the significant development of the modern trend toward expansion. The federal court's interpretation of Kentucky law, moreover, has been overruled by a subsequent decision of the Supreme Court of Kentucky holding in the

(Tex.1969); *Giberson v. Ford Motor Co.*, 504 S.W.2d 8 (Mo.1974); *Jones v. White Motor Corp.*, 61 Ohio App.2d 162, 401 N.E.2d 223 (1978); *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966). The general consensus clearly favors "bystander" recovery. *See generally* 63 Am.Jur.2d, *Products Liability* § 144; W. Keeton, *supra*, § 100, at 703–704 (5th ed. 1984); F. Harper, F. James, & O. Gray, *The Law of Torts* § 28.16, at 457–458 and nn. 7 & 9 (2d ed. 1986). The issue is also addressed in Annotation, *Products Liability: Extension of Strict Liability in Tort to Permit Recovery by a Third Person Who Was Neither A Purchaser Nor User of Product*, 33 A.L.R.3d 415 (1970). *See also Sills v. Massey–Ferguson, Inc.*, 296 F.Supp. 776 (N.D.Ind.1969); *Wasik v. Borg*, 423 F.2d 44 (2d Cir.1970) (interpreting Vermont law); King and Neville, *The Bystander's Right Under Strict Liability Does Exist: A Call for Reform of the Restatement*, 25 St. Louis U.L.J. 543 (1981).

This massive and essentially unanimous movement toward an expanded coverage for bystanders was summed up by W. Keeton, *supra*, at 704:

"Other jurisdictions have agreed with this decision [*Elmore v. American Motors Corp., supra*, 70 Cal.2d 578, 75 Cal. Rptr. 652, 451 P.2d 84, 33 A.L.R.3d 406 (1969)], until it is now generally followed. Its effect is obviously to put the strict liability on the same footing as negligence, as to all foreseeable injuries."

Persuaded by the example of our sister states as well as by the internal logic of the proposition, we hold that bystanders, such as Dr. Rangaswamy in this case, are protected under the doctrine of strict liability in tort.

*Sufficiency of Evidence
That Valk Designed the Hitch*

██ Valk argues that even if there was a genuine jury issue with respect to its manufacture of the hitch, there was

---

other direction. *Embs v. Pepsi Cola Bottling Co.*, 528 S.W.2d 703 (Ky.1975).

no evidence that it designed the hitch. After reviewing the testimony of Cecil Foster, the truck driver foreman for Montgomery County who was familiar with products manufactured by Valk, and considering the requirements for strict liability under § 402A, we hold that the evidence in this regard was legally sufficient to go to the jury.

*Assumption of the Risk*

*and/or*

*Contributory Negligence*

Valk strenuously argues that recovery in this case was barred because the deceased, as a matter of law, had assumed the risk. Concepts that mean different things in different contexts are being hopelessly jumbled together.

In the first place, let it be noted that the issue of an assumption of risk went to the jury and the jury found no assumption of risk.

Valk is both confusing assumption of risk with contributory negligence and confusing the assumption of risk of an automobile accident with the assumption of the risk of using a defective product. They are not the same.

■ Assumption of risk in the context of a defective product is the type of behavior contemplated by comment n to § 402A of *Restatement (Second) of Torts:*

"If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery."

In *Sheehan v. Anthony Pools,* 50 Md.App. 614, 440 A.2d 1085 (1982), Judge Moore discussed the type of conduct that would constitute the assumption-of-risk defense to a claim based on strict liability in tort and quoted with approval from *Luque v. McLean,* 8 Cal.3d 136, 104 Cal.Rptr. 443, 449, 501 P.2d 1163, 1169 (1972):

"Ordinary contributory negligence does not bar recovery in a strict liability action. 'The only form of plain-

tiff's negligence that is a defense to strict liability is that which consists in voluntarily and unreasonably proceeding to encounter a known danger, more commonly referred to as assumption of risk. For such a defense to arise, the user or consumer must become aware of the defect and danger and still proceed unreasonably to make use of the product.' " (Footnote omitted).

Without belaboring the point further, it is clear that Dr. Rangaswamy was not remotely aware that a defectively designed snowplow hitch, constituting a veritable battering ram, was proceeding at a significant rate of speed down the highway and was about to aggravate the imminent collision between Dr. Rangaswamy's Toyota and the Montgomery County truck. There is no remote suggestion that, knowing of such a risk, Dr. Rangaswamy deliberately elected to encounter it.

What Valk is arguing is in reality contributory negligence under the label of assumption of risk. The contributory negligence it argues, moreover, may have been negligence within the contemplation of automobile accident law but was not negligence within the contemplation of using a defectively designed product.

■ Contributory negligence is not available as a defense to strict liability in tort. As W. Keeton, *supra,* points out, at 462:

"In cases involving strict liability, not based upon wrongful intent or negligence, traditional contributory negligence is generally not available as a defense, a matter discussed further below." (Footnotes omitted).

The unavailability of contributory negligence as a defense to strict liability is indisputable Maryland law as well. *Ellsworth v. Sherne Lingerie, Inc.,* 303 Md. 581, 495 A.2d 348, 356 (1985); *Sheehan v. Anthony Pools, etc., supra,* at 50 Md.App. 622 n. 7, 440 A.2d 1090 n. 7.

### Proximate Causation

■ Appellant also argues that its motion for judgment and/or motion for judgment n.o.v. should have been grant-

ed on the issue of proximate cause. Appellant asserts that in a case such as this where the appellees seek to hold a manufacturer liable for "enhanced injuries" [3] arising from a product defect which, itself, did not cause the accident, the appellees have the burden of introducing evidence to show an enhancement of injuries. Specifically, appellant charges that under *Lahocki v. Contee Sand & Gravel Co., Inc.*, 41 Md.App. 579, 398 A.2d 490 (1979), *rev'd on other grounds*, 286 Md. 714, 410 A.2d 1039 (1980), where the alleged product defect does not cause an accident which results in death, the appellees must introduce evidence that the defect caused an otherwise survivable accident to be fatal. Appellant insists that the appellees, in the case at bar, failed to do this.

In *Lahocki*, the plaintiff sustained a paralyzing back injury when the vehicle in which he was riding, a van manufactured by the defendant, General Motors Corporation, collided with heavy timber barricades placed by a contractor, Contee Sand & Gravel Co., Inc. The plaintiffs made G.M. a defendant on the basis of an alleged defect in the van said to have "enhanced" the plaintiff's injuries. The defendant, G.M., relying upon *Huddell v. Levin*, 537 F.2d 726 (3d Cir.1976), argued that the plaintiff should have to prove the precise injuries which would have been sustained absent the defect. We declined to adopt such a standard believing it to be an unreasonable burden upon plaintiffs and contrary to public policy. We did, however, favor the alternative standard set forth in the dissenting opinion of *Huddell* where it was stated that "once a plaintiff has shown a *modicum* of enhanced injuries by testimony that the defect caused an otherwise survivable accident

---

**3.** The term "enhanced injuries" comes from what is known as "second collision" cases. These cases typically involve the happening of an automobile accident in which a design defect is alleged to have caused greater injuries than would have occurred absent the defect. The claimant has to show that his injury was "enhanced" through the lack of a proper design sufficient to safeguard him from a foreseeable injury resulting from an automobile accident.

to be fatal, the burden should shift to the defendants to apportion damages *inter se* and limit their liability if they can." *Huddell*, 537 F.2d at 747. We thus concluded that a plaintiff need show only some evidence of enhanced injuries.

The critical question is that of whether the appellees offered some evidence from which the jury could have found that "the defect caused an otherwise survivable accident to be fatal." It is clear that they did. There was evidence that the lift arm of the hitch entered the window of Dr. Rangaswamy's Toyota, striking him in the temple area. Margarita Korrell, the Deputy Medical Examiner, described in detail the extensive injuries to the left side of the head and brain of Dr. Rangaswamy. With respect to cause of death, she testified to the following:

"The injuries to the head were lethal, because they were massive. The injuries to the chest, they are less lethal. If treated in time, possibly he could have survived it ... the head injuries are not survivable and the chest injuries would have been survivable providing immediate, he had immediate medical attention or something like that."

There was, moreover, evidence that medical attention was immediately available. Under the circumstances, we see no error in allowing the issue to go to the jury.

*Expert Testimony*

*By Economist on Damages*

 Appellant next contends that the trial court committed error in permitting the appellees' expert economist, Dr. William Belmont, to testify as to the losses accruing to the appellees as a result of the decedent's death. While conceding that Dr. Belmont's testimony was admissible for this purpose, appellant insists, nonetheless, that Dr. Belmont's testimony merely succeeded in placing a price tag upon the corporation owned by the deceased. The crux of appellant's complaint is that the financial loss to the RDS Corporation, the business owned by the decedent, was a factor in the

assessment of damages and that it is improper to establish corporate losses as a pecuniary loss to the appellees.

We find no merit in appellant's argument. A review of the record reveals that Dr. Belmont's testimony was offered to determine the economic loss suffered by the appellees as a result of the death of the decedent, and was not offered to determine the economic loss to the corporation:

> "Q. And in attempting to come here and offer opinions, let me just make it clear in my own mind, were you attempting to determine the economic loss to the corporation or the loss to Mrs. Rangaswamy?
>
> A. The economic loss to Mrs. Rangaswamy ...
>
> Q. Okay.
>
> A. ... as a surviving member of the family."

Under the "Wrongful Death" statute, Md.Ann.Code, Courts & Judicial Proceedings, § 3–901 (Md.Ann.Code 1957, 1984 Repl.Vol.), the surviving widow and son of the deceased would be entitled to the present value of the pecuniary benefit which they might reasonably have expected to receive from the deceased had he lived. *Sun Cab Company v. Walston,* 15 Md.App. 113, 289 A.2d 804 (1972), *aff'd.* 267 Md. 559, 298 A.2d 391 (1973). Damages are measured by the pecuniary or financial loss suffered as a result of the deprivation of the part of the earnings of the deceased, which in this case the appellees would have received had the deceased lived. In a case such as this where the deceased was engaged in a business and the profits were earned largely as a result of the personal endeavors of the deceased, one measure of the earning ability of the deceased is the decline in profits following the injury. Generally, courts will admit evidence of the loss of such income if the evidence conforms to the requirement of establishing a reasonable probability that the injury brought about loss of profits and the evidence affords a basis for a reasonable estimate of the amount of such loss. The appellees laid the required foundation.

We perceive no abuse of discretion on the part of the trial court in admitting the testimony of Dr. Belmont.[4]

## Cross–Claim

### Against Montgomery County

■ The appellant, Valk, cross-claimed against Montgomery County, the owner of the dump truck that collided with the appellees' decedent, seeking contribution from the County under the Uniform Contribution Among Tort-feasors Act, Md.Ann.Code, Art. 50, § 16(a). The trial court found that the appellees' deceased was guilty of contributory negligence, as a matter of law, and directed a verdict in favor of Valk and Montgomery County on the negligence counts averred by the appellees. The trial court also granted the County's motion for judgment on the cross-claim of Valk and herein lies appellant's discontent.

Appellant argues that a manufacturer in a strict liability case is entitled to contribution from a tort-feasor guilty of simple negligence. Appellant asserts that there was evidence to indicate that the County was negligent in its use of the snowplow hitch and that the County should not be insulated from contribution by virtue of the Maryland Boulevard Rule. We agree with the appellant.

There was ample evidence that Montgomery County may have been guilty of negligence with respect to its misuse of the snowplow hitch, by failing to disconnect it.

The apparent flaw in the court's logic seems clear.

The fact that Montgomery County was let out of the case *vis-a-vis* the Rangaswamys apparently led to the mistaken notion that that somehow established that Montgomery

---

**4.** Appellant argues that the doctrine of "avoidable consequences" should be applied to bar appellees from recovering for that loss which they could have avoided by making a reasonably prudent "deal" for the sale of RDS. Again, the appellant's argument comes too late. The matter was not raised below and is, therefore, foreclosed on appeal. Md. Rule 1085.

County was free of fault. That mistaken notion apparently caused the court to rule in favor of Montgomery County, as a matter of law, with respect to the cross-claim for contribution brought against it by Valk.

Such was not the case. The facts never established that Montgomery County was free from fault. The facts only established that the contributory negligence of Dr. Rangaswamy precluded his representatives from doing anything about that fault. It would not, however, preclude others from seeking proper redress. The finding of contributory negligence, as a matter of law, against the appellees' decedent operated only to bar their recovery against Montgomery County, not to declare Montgomery County free of fault. As was explained by W. Keeton, *supra*, at 451–452:

"Unlike assumption of risk, the defense does not rest upon the idea that the defendant is relieved of any duty toward the plaintiff. Rather, although the defendant has violated his duty, has been negligent, and would otherwise be liable, the plaintiff is denied recovery because his own conduct disentitles him to maintain the action. In the eyes of the law both parties are at fault; and the defense is one of the plaintiff's disability, rather than the defendant's innocence."

We hold that a genuine jury question was generated on the issue of whether Montgomery County was negligent and that there was, therefore, a genuine jury issue on whether Montgomery County should be held liable to Valk for contribution.

JUDGMENT IN FAVOR OF THE APPELLEES RANGASWAMY, ET AL., AFFIRMED; JUDGMENT IN FAVOR OF THE APPELLEE MONTGOMERY COUNTY REVERSED AND REMANDED FOR NEW TRIAL AS TO APPELLANT'S CROSS–CLAIM FOR CONTRIBUTION; COSTS TO BE DIVIDED EQUALLY BETWEEN APPELLANT AND THE APPELLEE MONTGOMERY COUNTY.