770 A.2d 1072

Melissa M. HALLIDAY

v.

STURM, RUGER & COMPANY, INC.

No. 2095, Sept. Term, 1999.

Court of Special Appeals of Maryland.

April 25, 2001.

138

Andrew D. Freeman (C. Christopher Brown and Brown, Goldstein & Levy, LLP on the brief), Baltimore, for appellants.

Paul F. Strain (M. King Hill, III, and Venable, Baetjer and Howard, LLP, Baltimore, James P. Dorr, James B. Vogts and Wildman, Harrold, Allen & Dixon, Chicago, IL, on the brief), for appellees.

Argued before MURPHY, C.J., and DAVIS, HOLLANDER, SALMON, SONNER, KENNEY, DEBORAH S. EYLER, ADKINS, and KRAUSER, JJ.

DAVIS, Judge.

Appellant Melissa M. Halliday filed an action for wrongful death and a survivor's claim in the Circuit Court for Baltimore City against appellee Sturm, Ruger & Company, Inc., alleging strict liability for the self-inflicted shooting death of her three-year-old son, Jordan Garris.

Subsequent to the dismissal of all claims against the retailer of the handgun, On Target, Inc., appellee moved to dismiss, or in the alternative, sought summary judgment. On October 14,

1999, the Circuit Court for Baltimore City (Cannon, J.) granted summary judgment in favor of appellee, setting forth the basis for its ruling in a bench memorandum. From the grant of summary judgment, appellant filed this timely appeal, in which she asked questions that have been restated as follows:

I. Under Maryland law, is the "risk-utility test" applicable to handguns under a product liability claim?

II. Was the grant of summary judgment appropriate, either because the misuse of the dangerous instrumentality involved precludes any factual determination of foreseeability or because the "risk-utility test" is inapplicable?

III. When a product, by its very nature, is designed to inflict serious injury or cause death, were the appellee's warnings sufficient to establish, as a matter of law, that the handgun was misused?

## FACTUAL BACKGROUND

In March 1999, Clifton Garris, Jordan's father, purchased a Ruger P89 pistol from On Target, Inc., a firearms retail store and shooting range located in Severn, Maryland. The P89 pistol is a center fire, double action, magazine-fit, automatic loading, recoil-operated handgun.

In June 1999, three months after the purchase of the P89 pistol, Jordan discovered the handgun under his parents' mattress. The gun, stored separately from the ammunition magazine, had been kept there, unlocked, to be readily available to protect the home from intruders. Young Jordan allegedly was capable of loading the ammunition magazine into the handgun because he had seen similar semi-automatic weapons loaded and fired while watching television. As he played with the loaded pistol, it accidentally discharged and the young child suffered a fatal bullet wound to the head; he died two days later. Appellant, Jordan's mother and personal representative of his estate, brought this action, alleging that the handgun failed to include a safety device, i.e., a child-resistant trigger lock, and because the warnings and instruc-

tions given to Garris were inadequate to prevent the fatal accident.

The Circuit Court for Baltimore City delivered its oral opinion from the bench, in which it opined: [1]

THE COURT: This will be memorandum of opinion....

And the simple fact is, as the [appellant] has said, if the gun manufacturer put onto the gun device they've known about for a hundred years or so to make it certain that a three year old could not have fired it, the child would still be here. But they did not. So the question is really whether that failure to incert [sic] [safety device] made the gun defective under the products liability law.

. . .

There is much wrong if that's the case. Much wrong. The problem is that it's also clear the child's father knew this was also a very dangerous product. I must say my reaction to the warning argument is multiple. One, the suggestion the warnings provided were more than adequate were not impressive to me. I think the [appellant] has pointed out that this 35 paged [sic] booklet, with its warnings with respect to children, are relatively small, small type, and there is so much warning about so much; and, as I say that, I want to say I'm also equally aware of defendant's 4, [sic] the youth handgun safety action notice, which I think plaintiffs also correctly point out one can tell why it is titled, it is not directed towards [sic] three year olds. So in many ways, it seems the warnings are far from adequate. On the other hand, this is a handgun we're talking about where there is a question of whether any warning whatsoever is necessary because guns are made to kill people. That simple. Particularly a handgun such as this was not made for hunting. It was made to kill people, pure and simple.

---

1. While much of the opinion has not been reprinted, we believe that the extensive recounting of the basis for the lower court's ruling is essential to our analysis.

And so there are two questions, and that is, one, was any warning necessary? And the second, if a warning was necessary, that maybe, in fact, all of these warnings that are in this 35 paged [sic] booklet are equally necessary. Because we are, again, talking about a gun designed to kill people, so the warning on page 8, for example, about ammunition that says that death, serious injury and damage can result in the use of wrong ammunition, is a warning. That arguably is warning about not keeping it around children. The warning on page 6 about manual safety says placing the safety in an intermedial position between safe and fired can result in the user thinking the pistol is in a safety or fired position when it is not.

Likewise, the warning on page 10 about firing, the one on page 11 about handling, one on unloading and sliding, malfunctioning, there are lots and lots of warnings about what could go wrong ending up in the death of or a serious injury to someone because this is a gun.

*Look at it that way, the warning with respect to the children, it's more than adequate.* In addition, with respect to the issue of warning and sense of danger and the sense of the need to keep the gun away from children, I think the allegations made by the [appellant], again, are relevant. The allegations made in paragraph 16 which states that [the] three year old [child] found the gun under his father's mattress, clearly an allegation that it was put there with the expectation that it would not be found by this three year old. Goes on to say his father had hidden the gun there and had removed the magazine clip containing the bullets from the gun for safety, which I think clearly is also some indication making some effort to make this inherently dangerous product safe.

. . .

But on the issue of misuse, I think there are some things that lead me to conclude in this case that in terms of the misuse or superceding intervening cause or whatever, that I think makes a motion for summary judgement

[sic] in favor of the [appellee] appropriate, and that is *that we're talking about a gun. And a gun, where clearly the person who purchased it knew it was dangerous by the way it was handled, and in response to the argument about the risk utility test, I think that what the Court of Special Appeals said in Keller (sic) veruss [sic] Archie Industries is that the risk utility test is applicable and only applied when something goes wrong with a product. And I think what they're talking about is not something going wrong in the sense of clearly [appellant] was right, something went wrong in the sense that a three year old was killed and that's very wrong, but not in the sense of the gun behaving the way one would predict the gun should behave, and in the sense the gun operated the way it should have,* I think also, really even stronger here, is that it is a misdemeanor for someone to possess a gun, to store or leave a loaded firearm in any location where an individual knew or should have known that an unsupervised minor child would have access to it. I say that realizing that is a heavy burden for the father of the child and the mother of the child also to be stuck with. And I say that because *that makes it different than the Klien [sic] case, relied upon by the [appellant], where the warning is putting one finger in the wrong place, which was not a criminal offense,* nor should it have been a criminal offense, but simply was a sense of sloppy use, similar to the *Elsworth* [sic] case involving the nightgown which might not even be termed sloppy use, but which is predictable; but with respect to *Klien* [sic], it can be described as sloppy use. And I say that because I do believe the [appellant] is right, *Klien* [sic] does make clear that a warning by itself doesn't obviate the problem. If that really was what this case turned on, I would reach a different result, but the problem here is something, as I said, the question is whether any warning was needed; second, whether, because of the type of product it was, you need to read the manual to get all the warnings, because it was so dangerous and so deadly; and third, it

is clear the child's father knew about all these dangers. And also, one way of dealing with this has to make it a criminal offense to put that gun in a place where the child would get to it.

. . .

On appeal, appellant does not pursue the claim of inadequate warnings and instructions regarding the operation of the handgun received by the elder Garris at the time of sale.

## STANDARD OF REVIEW

We summarized our appellate review of a trial court's ruling on a motion for summary judgment in *Bond v. NIBCO,* 96 Md.App. 127, 134–36, 623 A.2d 731 (1993):

Maryland Rule 2–501 provides in pertinent part:

Any party may file at any time a motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law.... The response to a motion ... shall identify with particularity the material facts that are disputed.... The court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law.

... Thus, a moving party must set forth sufficient grounds for summary judgment. Although the movant is not required to support his [or her] motion with an affidavit unless he [or she] files it "before the day on which the adverse party's initial pleading or motion is filed," ..., he [or she] must support his [or her] various contentions by placing before the court *facts that would be admissible in evidence or otherwise detailing the absence of evidence in the record to support* a cause of action. ...

Discussing the trilogy emanating from the Supreme Court, we continued:

The Supreme Court and the Court of Appeals have, in recent years, emphasized that a trial court should not be reluctant to grant a motion for summary judgment in an appropriate case. *See,* e.g., *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986);.... In *Seaboard Surety Co. v. Richard F. Kline, Inc.,* 91 Md.App. 236, 242–45, 603 A.2d 1357 (1992), we discussed at some length these teachings, emphasizing that a motion for summary judgment, although not a substitute for trial, is nevertheless *not* disfavored. A proper summary judgment motion is to be granted unless the parties truly dispute a material fact, *i.e.,* the evidence is such that a fair[-]minded jury could return a verdict for the nonmovant. *Id.* at 244, 603 A.2d 1357. For this reason, although a party opposing a proper motion for summary judgment need not file an affidavit unless "the motion ... is supported by an affidavit or other statement under oath," ..., the opponent cannot rely on formal denials or general allegations. ... Instead, an opponent must "identify with particularity the material facts that are disputed." ... Thus, *"[w]hen a moving party has set forth sufficient grounds for summary judgment,* the party opposing the motion must show with 'some precision' that there is a genuine dispute as to a material fact," ..., and place before the trial court facts that would be admissible in evidence. ...

... That is, if the summary judgment motion is based on facts not contained in the record or papers on file in the proceeding it "shall be supported by affidavit and accompanied by any papers on which it is based." ...

Moreover, as the Supreme Court noted in articulating its now famous *Celotex* holding, even when an affidavit is not necessary

... a party seeking summary judgment *always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings,* depositions, answers to interrogatories

and admissions on file, together with the affidavits, if any," *which it believes demonstrate the absence of a genuine issue of material fact.*

*Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548, (emphasis added). "To satisfy the requirement that there be no genuine dispute as to any material fact, the moving party *must include in the motion the facts necessary to obtain judgment and a showing that there is no dispute as to any of those facts."* ... *Only* if a movant "bears this initial responsibility" or makes this "showing" does the party opposing the summary judgment motion have the burden of identifying "with particularity the material facts that are disputed." ... Thus, a motion for summary judgment that simply asserts that the opponent has not identified disputed facts is not sufficient. A summary judgment movant usually is not required to file an affidavit, ..., but *if* the movant disputes facts alleged in the complaint (or answer if the movant is the plaintiff), the movant must himself [or herself] identify the portions of the record that "demonstrate the absence of a genuine issue of material fact." ... Indeed, the movant must attach "as an exhibit" to his motion "any document" that he "wishes the court to consider in ruling on the motion ... unless the document is adopted by reference as permitted by Rule 2–303(d) or set forth as permitted by Rule 2–432(b)." ...

## DISCUSSION

At the outset, it should be noted that appellant has abandoned any claim that the warnings provided by appellee were inadequate. The adequacy of the warnings is therefore pertinent only as a refutation of appellant's denial that Garris misused the subject firearm.[2] Citing the Restatement of Torts (Third), Products Liability, and *Klein v. Sears, Roebuck*

---

2. Appellant, in oral argument before this Court and in written submissions to this Court and the trial court, admitted that the warnings provided by appellee were adequate to entitle it to summary judgment on that issue.

*& Co.,* 92 Md.App. 477, 486, 608 A.2d 1276 (1992), appellant initially asserts that this Court has "made clear that the risk-utility test applies to a claim that the absence of a safety device renders a design defective." She alludes to a statement in *Klein* that "the absence of a safety device may clearly be a design defect, even in a product that does not 'malfunction.'" Ultimately, appellant contends that

> [t]he trial judge mistakenly applied the consumer-expectations test rather than the risk-utility test. While acknowledging plaintiff's argument that "there is certainly no reason that it should be easier for a three year old to use a handgun than ... to open an aspirin bottle," the court failed to weigh the risks from the absence of a child-resistant safety device against the utility of not incorporating it. Instead, the court observed that "guns are made to kill people. That simple. Particularly a handgun such as this that was not made for hunting. It was made to kill people, pure and simple." The trial court mistakenly believed that the risk-utility test did not apply because "the gun behav(ed) the way one would predict the gun would behave," *i.e.* the gun passed the consumer-expectations test.

Finally, appellant asseverates that "the trial court mistakenly relied on *dictum* in *Kelley v. R.G. Industries,* 304 Md. 124, 138, 497 A.2d 1143 (1985), that said that the risk-utility test does not apply in the absence of a 'malfunction.'"

## SUMMARY JUDGMENT

Appellee's Memorandum of Law in Support of Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment, after asserting that appellee is entitled to judgment as a matter of law because the facts, as recited in the complaint, "clearly exonerate [appellee]," sets forth two "factually related, but distinct legal grounds," to wit: (1) "that the firearm was not in a defective condition or unreasonably dangerous as a matter of law" and (2) that "the pistol was used in a manner that was contrary to clearly worded instructions and warnings that accompanied the product when sold." The alleged undisputed material facts relied upon by appellee are:

1. The instruction manual warned that firearms should always be stored securely and unloaded away from children and careless adults; firearms should only be loaded when ready to shoot; firearms should be locked in racks or cabinets when not in use; ammunition should be stored separate from firearms; firearms should be stored out of sight of visitors and children; it is the gun owner's responsibility to be certain that children and persons unfamiliar with firearms cannot gain access to firearms, ammunition, or components; and users should read the instructions and warnings in the manual carefully before using firearm.

2. Edward DeCarlo, the On Target salesman who sold the pistol to Garris, reviewed the manual with him and explained how to load and unload the gun and operate the manual safety. Garris signed a statement in which he acknowledged that DeCarlo had "demonstrated and/or explained" how to load and unload the weapon, the purpose and function of the safety mechanism(s) and how to work it (them), that Garris understood that he should treat the weapon as if it were loaded until he personally made certain that it was not loaded, and that he intended to use the weapon in a lawful manner. Garris also received a "Youth Handgun Safety Act Notice" distributed by the Bureau of Alcohol, Tobacco and Firearms, which read: "Safety storing and securing firearms away from children will help prevent the unlawful possession of handguns by juveniles, stop accidents and save lives."

3. Garris received from On Target a lockable box and padlock provided by appellee and he was offered a trigger lock[3] which he could purchase as an additional safety precaution.

4. The undisputed material facts, for purposes of the Motion for Summary Judgment, extracted from the complaint are that Garris stored the pistol under his mattress and stored the magazine containing bullets on a book shelf; that three-year-old Jordan found the gun and the loaded magazine and,

---

**3.** Garris's affidavit disputes this assertion.

"having seen semi-automatic pistols loaded and fired on television, was able to put the magazine clip in the gun" and the gun discharged while Jordan "played with the gun."

The trial judge was, in the first instance, required to determine if the allegations set forth in the complaint stated a cause of action in strict product liability and, if so, whether appellant's claim, on the above material facts, if undisputed, survives the Motion for Summary Judgment.

■ Appellant argued in her opposition to the motion that the handgun was defective and unreasonably dangerous under the risk-utility test, "[b]ecause the risk from excluding child safety features outweighs the utility of that exclusion, and because alternative safer designs could have been adopted economically...." She also argued that, because it was reasonably foreseeable to appellee, "any warning to store the gun locked and unloaded would not be followed by a significant proportion of gun owners," Garris's improper storage of the gun did not constitute misuse and thus could not defeat the design defect claim.[4]

The opposition was accompanied by two affidavits, one of which was given by Garris. The contents of Garris's affidavit are consistent with the facts relied upon by appellee, except

---

**4.** Appellant advanced two further legal arguments. First, she asserted that Garris's actions could not bar recovery because "[t]he negligence of a parent may not be imputed to an infant...." *See* Md.Code (1998 Repl.Vol.), Cts. & Jud. Proc. § 10–910. Under this provision, a parent's negligence cannot preclude recovery by an infant unless it is an "independent and superseding cause of the child's injuries." *Caroline v. Reicher,* 269 Md. 125, 130, 304 A.2d 831 (1973). The relevant inquiry is "whether what occurred reasonably was to have been anticipated as a result of ... the defendant's acts or omissions ..." *Id.* at 133, 304 A.2d 831 (quoting *Farley v. Yerman,* 231 Md. 444, 450, 190 A.2d 773 (1963)). We note that this is substantially similar to the foreseeability test used in the misuse inquiry, *see Simpson v. Standard Container Co.,* 72 Md.App. 199, 206, 527 A.2d 1337 (1987), so that actions constituting misuse are necessarily a superseding cause of the injury. Because we determine that Garris's actions constituted misuse as a matter of law, we do not reach this argument.

Second, appellant argued that the warnings accompanying the gun were defective, a contention that has been abandoned on appeal. *See supra* note 2 and accompanying text.

for his assertion that "[n]o one at On Target or elsewhere ever offered to sell me a trigger lock or explain the need for one. Indeed, the first time I ever saw a trigger lock was on August 20, 1999," three months after Jordan's death. Garris also stated that he "glanced through the owner's manual" when he purchased the gun, but did "not recall reading any warnings regarding storage of the gun." This statement is arguably in conflict with DeCarlo's version of events.

The affidavit of Stephen P. Teret also accompanied appellee's opposition. Teret is a professor at the Johns Hopkins School of Hygiene and Public Health and the director of the Johns Hopkins Center for Gun Policy and Research. In large part, the affidavit consists of a recitation of statistics on unintentional firearm deaths and unsafe firearm storage practices culled from a compendium of government compilations and articles in medical journals. Of the ten articles cited, two were co-authored by Teret. The affidavit also contains a number of unattributed factual assertions:

8. A recent study has found that boys will play with a gun they find in a seemingly safe environment, including pulling the trigger of the gun, as if it were a toy.

9. For more than a century, gun manufacturers have been aware of the risk that handguns pose to children. Beginning in the late 1880[']s, Smith & Wesson designed and marketed a handgun they said could not be operated by an ordinary child under the age of 8.

. . .

11. A well-recognized and accepted tenet of the discipline of injury prevention is that a more effective method of preventing injuries to children is to design safety into products than to instruct the users and owners of the products to behave in a safe manner at all times.

Teret's affidavit also contains several opinions. He attributes to an editorial that he co-authored the opinion that "childproof or personalized handguns, which are operable only by authorized users, are viable design options. . . ." He also opines:

Based upon the incidence of unintended gun-related deaths to children, the knowledge of prevalent unsafe gun storage by adults in homes with children, the existence of feasible design changes that could make guns more child resistant, and the relative ineffectiveness of warnings and instructions compared to product modifications for the protection of children, it is my opinion that the reliance by [appellee] on materials in its owner's manual and the provision of a lockable carrying case was inadequate to protect children from the risk of unintended gun death.

There was also a third exhibit attached to appellant's opposition, a picture of a handgun labeled, "Smith & Wesson childproof handgun, circa 1894."

■ The opposition to a motion for summary judgment must be supported by "facts that would be admissible in evidence...." *Bond,* 96 Md.App. at 134, 623 A.2d 731; *see Vanhook v. Merchants Mut. Ins. Co.,* 22 Md.App. 22, 26, 321 A.2d 540 (1974) ("Each opposing party is given ample opportunity to place before the court facts which, on the one hand, show that he [or she] is entitled as a matter of law to the ruling he [or she] seeks, or on the other hand, show that a fact, material to the opponent's position, is disputed.")[5] In

---

**5.** The standard for reviewing an evidentiary determination made during a court's consideration of a summary judgment motion is unclear. *Compare Imbraguglio v. Great Atlantic & Pacific Tea Co.,* 358 Md. 194, 205, 747 A.2d 662 (2000) (affording the trial court no deference in holding that an unsworn statement "was not part of the record properly considered on summary judgment."), *with Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship,* 109 Md.App. 217, 287, 674 A.2d 106 (1996), *and Helinski v. Rosenberg,* 90 Md.App. 158, 167–71, 600 A.2d 882 (1992) (each reviewing a trial court's rejection of a purported expert witness's affidavit on summary judgment under the abuse of discretion standard). Here, our holdings regarding Garris's affidavit and the purported photograph of the Smith & Wesson handgun would be the same under either standard. It is unclear from the trial court's oral opinion whether it considered Teret's expert opinion.

Which brings us to the issue of misuse. [Appellant's] reaction [is] that it is foreseeable this type of accident would happen, that the affidavit attached to plaintiff's response spells out, this kind of outcome is very foreseeable that this type of accident is going to happen; and [appellee's] response to that is there is no evidence that it

*Vanhook,* we offered a list of methods of placing such facts before the court, including by affidavit, deposition transcript, answers to interrogatories, admissions of facts, stipulations, and, under some circumstances, pleadings. *Vanhook,* 22 Md. App. at 26–27, 321 A.2d 540. Turning to the admissibility of the facts alleged by appellant, we first note that there is no basis for the admission of the purported photograph of the Smith & Wesson handgun. *See* Md. Rule 5–901 (2001) (requiring "evidence sufficient to support a finding that the matter in question is what its proponent claims" as a "condition precedent to admissibility."). Appellee did not raise this infirmity before us or the trial court, however, so we must treat the photograph as authentic.

 An affidavit submitted in opposition to a motion for summary judgment "must show that the person making it has personal knowledge of and is competent to testify to the facts stated." *Vanhook,* 22 Md.App. at 26, 321 A.2d 540. "An affidavit suffices in the summary judgment context to place before the court a fact that, *if* testified to by the affiant at trial, would be admissible, even though the affidavit itself generally is not admissible at trial." *Imbraguglio v. Great Atlantic & Pacific Tea Co.,* 358 Md. 194, 207, 747 A.2d 662 (2000). Garris's affidavit meets these standards.

 The admissibility of Teret's affidavit is more problematic. The affidavit contains an affirmance that its contents

---

happens with our gun when we sell it with a lock box and with our warnings. But I don't think that that really is relevant in terms of foreseeability issues because, if it is, then the case should go forward and have discovery to find out if the lock box and the instruction manual makes [sic] any difference whatsoever. There is nothing in front of me to indicate it does. So I would have to guess and assume it does. And I'm not prepared to do that.

In fact, based upon what's in the affidavit, there would be no reason to do that based upon what is in the affidavit. If I want to take a guess based upon the affidavit, the guess would be in the opposite direction. But I don't believe it is ever appropriate for the court to guess and certainly not appropriate for the court to make guesses on motion for summary judgment. So I won't do that.

We are therefore left without an exercise of discretion to review, and we must consider the issue *de novo.*

are based on personal knowledge, but the admissibility of some of the statements is at issue. First, Md. Rule 2–311(c) (2001) requires a party to "attach as an exhibit to a written motion or response any document that the party wishes the court to consider in ruling on the motion or response ..." *See Bond,* 96 Md.App. at 135, 623 A.2d 731 (confirming that a "party moving for summary judgment, like a party filing any other motion, must comply with Md. Rule 2–311."). Although the affidavit mentions eleven studies, ten of them by name, and one editorial, none of the documents were attached to appellant's opposition. This omission deprived the court of the opportunity to examine the details of the studies in order to assess the basis for Teret's expert opinion. Because a full citation and a short description were given for each study, however, appellant's failure to comply with the technical requirements would not have been a proper basis for the grant of summary judgment. *See Bond,* 96 Md.App. at 141, 623 A.2d 731 (reversing grant of summary judgment where moving party "did not identify and attach any pleading, deposition, interrogatory answer, admission, affidavit, or other document" demonstrating the absence of a genuine issue of material fact); *Brown v. Suburban Cadillac, Inc.,* 260 Md. 251, 256–57, 272 A.2d 42 (1971) (affirming grant of summary judgment where opposing party's affidavit contained only generalized allegations and repeatedly "refer[red] to a 'power of attorney,' but [did] not produce such a document or state any particular facts which would support the allegations made concerning its existence.").

■ Appellee argues on appeal that the studies described in Teret's affidavit are "immaterial to the foreseeability of Garris's specific misconduct with this specific firearm, with its features and warnings, by [appellee]." The Court of Appeals stated in *Locke, Inc. v. Sonnenleiter,* 208 Md. 443, 447–48, 118 A.2d 509 (1955):

> The rule followed by the majority of the cases is that if the evidence as to past accidents, tendencies or defects is sufficiently relevant and illuminating because there is similarity of time, place and circumstance, it will be admissible—not as

direct evidence of negligence but to show the existence of a danger or defect in the character of a place, method or appliance and *to show knowledge or notice of the danger or defect on the part of the defendant,* unless, in its discretion, the trial court believes it will cause an unfair surprise or confusion by raising collateral issues.

(Citations omitted), *cited in Cutlip v. Lucky Stores, Inc.,* 22 Md.App. 673, 696, 325 A.2d 432 (1974).

In *Ellsworth v. Sherne Lingerie, Inc.,* 303 Md. 581, 495 A.2d 348 (1985), the Court of Appeals discussed the admissibility of certain government reports on "deaths, injuries and economic losses resulting from accidental burning of products, fabrics, or related materials...." *Id.* at 600 n. 15, 495 A.2d 348. The plaintiff in *Ellsworth,* who was injured when her nightgown caught on fire, brought a strict liability action against the clothing manufacturer. Although the fabric of the nightgown met federal flammability standards, the plaintiff alleged that the fabric's propensity to ignite rendered it unreasonably dangerous. The evidence in question was focused on "the incidence and severity of burns caused by ignition of clothing that was subject to the Federal standard...." *Id.* at 601, 495 A.2d 348. We held that the trial court erred in excluding this evidence because "[t]he reports are material to the issues and tend to establish the proposition that the nightgown as sold was unreasonably dangerous to prospective users...." *Id.* at 602, 495 A.2d 348.

In the case *sub judice,* the government statistics cited by Teret have no relevance to the issues on summary judgment. He describes the documents as listing the number of children under five and under ten who suffered "unintentional, gun-related deaths." Judging, as we must, solely from Teret's description, the statistics contain no information on how these deaths occurred, such as what types of guns were involved, where the guns were found, whether the guns were equipped with safety devices, or even whether the guns were in the possession of children when the shootings occurred. Unlike the evidence in *Ellsworth,* where the flammability of a fabric meeting the same government standard as those studied was

directly at issue, these government statistics are of little probative value. The unnamed "recent study" finding that "boys will play with a gun they find in a seemingly safe environment" is likewise patently lacking in probative value.

The published studies cited by Teret vary in their focus. One article co-authored by Teret studied 88 unintended gunshot deaths of children in California, finding that a substantial number were self-inflicted and involved handguns that were stored loaded and unlocked. Teret's other article studied 131 such deaths, finding that the majority involved handguns and that, of those handguns, nine were manufactured by appellee. These studies are slightly more similar to the case before us, but are still not sufficiently probative to be admissible. *See Locke,* 208 Md. at 447–48, 118 A.2d 509 (discussing the danger that "evidence as to past accidents" may cause "confusion by raising collateral issues."). Appellee has not denied the foreseeability of young children playing with and being injured by handguns, or even of handguns being improperly stored. Its misuse argument focuses, rather, on the warnings it gave, and the foreseeability of a handgun owner improperly storing one of its handguns despite them. The four studies cited that give statistics solely on improper storage suffer from the same infirmity.

Two of the studies cited by Teret go beyond the recitation of statistics on unsafe gun storage in houses with children. One states that "[s]afety instruction . . . even if provided by the military or in a formal class, is not associated with safe gun-handling procedures as they relate to keeping guns loaded." The other study found that "[i]ndividuals who received firearm training were significantly more likely to keep a gun in the home both loaded and unlocked," and concluded that "complete reliance on the training strategy may be misplaced." It is unclear, however, what safety procedures were taught in these classes, or indeed whether the "firearm training" in the second study included safety instruction at all. Moreover, appellee's misuse theory in this case relies on the warnings and instructions contained in its manual, not in a class. Appellant failed to establish sufficiently the relevance

of any of these studies in her submission in opposition to the motion for summary judgment; they therefore were not properly before the court.

█ At the summary judgment stage, the court was correct in assuming the truth of Teret's statement that, "[f]or more than a century, gun manufacturers have been aware of the risk that handguns pose to children." The same is true of his statement that to design a product with safety features is a more effective method of preventing injuries to children than safety instructions.

The two opinions contained in Teret's affidavit were dissimilar. The first, expressed as a summary of the contents of an editorial Teret co-authored, is that "the design of handguns can be modified to increase the safety of children," and that "childproof or personalized handguns ... are viable design options for handgun manufacturers." As the Court of Appeals stated in *Beatty v. Trailmaster Products, Inc.,* 330 Md. 726, 741, 625 A.2d 1005 (1993), "an expert opinion derives its probative force from the facts on which it is predicated, and these must be legally sufficient to sustain the opinion of the expert." (Citation and internal quotation omitted.) Teret's opinion on the viability of safer design options is supported, albeit tenuously, by the factual assertion about the Smith & Wesson handgun. In the absence of the studies he cited in the affidavit, whose relevance was not established, Teret's other, more comprehensive opinion may be restated as follows:

> Based upon the existence of feasible design changes that could make guns more child resistant, and the relative ineffectiveness of warnings and instructions compared to product modifications for the protection of children, it is my opinion that the reliance by [appellee] on materials in its owner's manual and the provision of a lockable carrying case was inadequate to protect children from the risk of unintended gun death.

If we assume Teret's remaining factual assertions to be true, this opinion, too, is supported by a sufficient factual basis.

In summary, there were two main issues before the trial court as it considered the motion for summary judgment: (1) whether the handgun sold to Garris was in a defective condition and unreasonably dangerous and (2) whether Garris's improper storage constituted an unforeseeable misuse of the handgun. The only facts in dispute were whether Garris was offered a trigger lock when he purchased the handgun and how thoroughly Garris and the On Target salesman reviewed the instruction manual on the day of the purchase. These areas of dispute were not sufficient to defeat summary judgment; however, neither was dispositive of the two issues outlined above.

The undisputed facts, including the warnings contained in the instruction manual, the delivery to Garris of a lockbox and padlock, and the circumstances of the accident, constituted a core of material facts upon which the lower court could properly determine the entitlement to judgment as a matter of law. For her part, undisputed were appellant's submissions that the gun manufacturers have been aware of the dangers of handguns to children for over a century, that childproof and personalized handguns are viable design options, that design improvements are more effective than safety instructions in preventing injuries to children, and that "the reliance of [appellee] on materials in its owner's manual and the provision of a lockable carrying case was inadequate to protect children from the risk of unintended gun death."

The court, therefore, had facts which were material to the resolution of the controversy before it and upon which it could properly decide which party was entitled to judgment as a matter of law, notwithstanding the disputed claim of appellee that it made a trigger lock available to Garris and that DeCarlo did not review the warnings and instructions with him. In other words, accepting as true the facts that DeCarlo had not offered a trigger lock and that he had not discussed the warnings and instructions with Garris, these assumed facts, in conjunction with the undisputed facts in support of appellant's opposition to the motion for summary judgment discussed, *supra*, represented the putative evidence in the

light most favorable to appellant. Thus, from the undisputed facts and facts assumed to be true relied upon by appellant, for purposes of the motion, as well as the undisputed facts relied upon by appellee, the trial court had before it the material facts to rule on the motion for summary judgment. Specifically, it could make a determination as to whether, in contemplation of controlling legal authority, the handgun sold to Garris was in a defective, unreasonably dangerous condition and whether the improper storage of the handgun by Garris constituted an unforeseeable misuse of the gun.

Morever, appellant's attempt to create a factual dispute that DeCarlo offered a trigger lock is undermined by her position before us at oral argument, urging that the external trigger lock the salesman said he made available did not constitute the type of safety device that would have corrected the alleged defect. Appellant also maintained, at oral argument before us, that irrespective of how prominent or graphic the written warnings issued at the time of sale had been, they would not have operated to render Garris's violation of State law in the manner of storing the handgun, his negligence in storing the gun under the mattress and his lack of supervision of a three-year old unforeseeable. Thus, appellant's attempt to generate a factual dispute regarding whether DeCarlo reviewed the instructions and warnings is adverse to her stated position that Garris's course of conduct should have been foreseeable despite any warnings which may have been given.

The dissenting opinion posits that our decision "unjustifiably removes from the trier of fact" (1) whether the incorporation of a safety device is a workable design option under the risk-utility test; (2) whether the storing of the handgun under a mattress is reasonably foreseeable and therefore not a misuse of the product; and (3) whether the warnings or instructions provided by appellee sufficiently warned against the reasonably foreseeable, yet unintended or incorrect use of the product. As we have noted, appellant insists that no warnings would have been sufficient, thereby removing the adequacy of those warnings as a factual issue for submission to the jury. Regarding whether the reasonable foreseeability of storage of

the handgun under a mattress was a factual matter, we conclude, *infra*, that such storage of the handgun under the circumstances, *sub judice*, i.e., within the reach of an unsupervised three-year old in violation of State law, constitutes misuse as a matter of law. Even were we to determine whether improper storage of the handgun was reasonably foreseeable is a factual matter, appellee would nonetheless be entitled to summary judgment in the case at hand, given that Maryland law is that the risk-utility test is inapplicable to handguns which do not malfunction. No factual issue is generated because it is immaterial as to whether the incorporation of a safety device is a workable design option under a standard-the risk-utility test-that does not apply. For the reasons we set forth, *infra*, the undisputed facts which are material establish that the handgun did not malfunction and was, therefore, not defective and appellant's improper storage and failure to heed warnings constituted an unforeseeable misuse of the handgun.

### *KELLEY v. R.G. INDUSTRIES:* THE HOLDING OR OBITER DICTUM

■ Appellant characterizes as *dictum* the Court's statement in *Kelley* that the risk-utility test is inapplicable to a handgun unless it malfunctions. *See Kelley*, 304 Md. at 138, 497 A.2d 1143. The term *dictum* is an abbreviated form of *obiter dictum*, which is translated as "a remark by the way." Black's Law Dictionary 454 (6th ed.1990). It refers to a statement made by a court "incidentally or collaterally, and not directly upon the question before it, or upon a point not necessarily involved in the determination of the cause...." *Id.* at 1072. *Obiter dictum* lacks the authority of adjudication. *Stover v. Stover*, 60 Md.App. 470, 476, 483 A.2d 783 (1984); *see Bryan v. State Roads Comm'n*, 115 Md.App. 707, 712–13, 694 A.2d 522 (1997). It is not entitled to the precedential weight afforded the holding because it does not receive "the deliberate and considered judgment" used in phrasing the holding. *State v. Wilson*, 106 Md.App. 24, 36, 664 A.2d 1 (1995).

*Kelley* came before the Court of Appeals on certification from the United States District Court. The Court rephrased the four certified questions as three new questions [6] and dealt with them *seriatum. Kelley,* 304 Md. at 131, 497 A.2d 1143. The Court first addressed the question of whether a handgun manufacturer or marketer could be held liable under strict liability theories for injuries such as Kelley's. It found that liability could not be based on Restatement (Second) of Torts §§ 519 and 520 (1965) governing abnormally dangerous or ultrahazardous activity because this doctrine "does not apply to the manufacture or marketing of handguns." *Id.* at 133, 497 A.2d 1143.

The Court next looked to the applicability of Restatement (Second) of Torts § 402A, which holds liable the seller of a product "in a defective condition unreasonably dangerous." *Id.* at 134, 497 A.2d 1143. Applying the "consumer-expectation" test, the Court found that a normally operating handgun is not in a defective condition. *Id.* at 136, 497 A.2d 1143. It then turned to the alternative "risk-utility" test, finding that it can only be used "when something goes wrong with a product." *Id.* at 138, 497 A.2d 1143. Because "a handgun which injured a person in whose direction it was fired ... worked precisely as intended," the risk-utility test was "inapplicable to the present situation." *Id.* The Court then considered whether to extend the common law to make the manufacturers and marketers of handguns liable for gunshot injuries, but determined that this "would be contrary to Maryland public

---

**6.** The rephrased questions were as follows:

 1) Is the manufacturer or marketer of a handgun, in general, liable under any strict liability theory to a person injured as a result of the criminal use of its product?

 2) Is the manufacturer or marketer of a particular category of small, cheap handguns, sometimes referred to as "Saturday Night Specials," and regularly used in criminal activity, strictly liable to a person injured by such handgun during the course of a crime?

 3) Does the Rohm Revolver Handgun Model RG38S, serial number 0152662, fall within the category referred to in question 2?

*Kelley,* 304 Md. at 131, 497 A.2d 1143.

policy as set forth by the Legislature." *Id.* at 144, 497 A.2d 1143.

Turning to its second rephrased question, the Court found that the class of handguns known as "Saturday Night Specials" was intended for and suited to uses that were inconsistent with Maryland public policy. *Id.* at 147–53, 497 A.2d 1143. It also took notice of "the ever growing number of deaths and injuries due to such handguns being used in criminal activity," *id.* at 157, 497 A.2d 1143, and determined that "the manufacturer or marketer of a Saturday Night Special knows or ought to know that the chief use of the product is for criminal activity," *id.* at 156, 497 A.2d 1143. The Court thus recognized "a separate, limited area of strict liability for the manufacturers, as well as all in the marketing chain, of Saturday Night Specials." *Id.* at 157, 497 A.2d 1143. Finally, the Court answered the third rephrased question, whether the handgun that caused Kelley's injuries was a Saturday Night Special, in the affirmative.[7] *Id.* at 159–61, 497 A.2d 1143.

The Court's statement that the risk-utility test was inapplicable to "a handgun which has not malfunctioned" was not *obiter dictum.* Based on the structure and history of the decision, pellucidly, the Court made this finding not "incidentally or collaterally," but in response to Kelley's contention that R.G. Industries was liable under § 402A. As the Court of Appeals stated in *State v. Board of Education,* 346 Md. 633, 641, 697 A.2d 1334 (1997), "[a]n appellate court's rejection of a reason given by a litigant for the relief sought in the case is not 'dicta.' " Moreover, the procedural posture of the case necessitated answering each of the questions certified by the U.S. District Court, making consideration of the applicability of Restatement (Second) of Torts § 402A absolutely necessary. Thus, the holding in *Kelley* that the risk-utility test is inapplicable to handguns is neither "incidental" nor "collater-

---

7. The Court also discussed the effective date of the "modification of Maryland common law tort principles" it had fashioned. *Id.* at 161–62, 497 A.2d 1143.

al" to the decision and, indeed, the Court set forth an extensive explication in support of that holding.

None of the cases which have construed *Kelley* has overturned *Kelley* or have rejected its ultimate holding that "the risk[-] utility test cannot be extended to impose liability on the maker or marketer of a handgun which has not malfunctioned." *Kelley*, 304 Md. at 138, 497 A.2d 1143. Although the Court of Appeals has cited to *Kelley* several times, none of its opinions has addressed this specific aspect of the decision.[8]

This Court has dealt with the issue in two opinions and, while we distinguished both cases from *Kelley*, we have neither questioned nor rejected it. In *C & K Lord, Inc. v. Carter*, 74 Md.App. 68, 536 A.2d 699 (1988), we applied the risk-utility test in finding that a conveyer belt in which the plaintiff's arm was injured was defective. We stated that, "although the *Kelley* language [on malfunction] is clearly applicable to instrumentalities such as handguns, it is inapplicable where as here, the design defect is the failure to include

---

**8.** The majority of these cases have discussed the Court's ability or willingness to modify the common law. *See Parker v. State*, 337 Md. 271, 283 n. 7, 653 A.2d 436 (1995); *State v. Hawkins*, 326 Md. 270, 292–94, 604 A.2d 489 (1992); *Owens–Illinois, Inc. v. Zenobia*, 325 Md. 420, 469–70, 601 A.2d 633 (1992); *Murphy v. Edmonds*, 325 Md. 342, 362, 601 A.2d 102 (1992); *Erie Ins. Co. v. Chops*, 322 Md. 79, 91, 585 A.2d 232 (1991); *Gaver v. Harrant*, 316 Md. 17, 28, 557 A.2d 210 (1989); *Miles Labs., Inc. Cutter Labs. Div. v. Doe*, 315 Md. 704, 724, 556 A.2d 1107 (1989); *Anne Arundel County v. Fraternal Order of Anne Arundel Detention Officers & Personnel*, 313 Md. 98, 106–07, 543 A.2d 841 (1988); *Ireland v. State*, 310 Md. 328, 331, 529 A.2d 365 (1987); *Harris v. State*, 306 Md. 344, 357, 509 A.2d 120 (1986). Others have discussed the prospective nature of such modifications, *see Julian v. Christopher*, 320 Md. 1, 10–11, 575 A.2d 735 (1990); *American Trucking Ass'ns, Inc. v. Goldstein*, 312 Md. 583, 592 n. 7, 541 A.2d 955 (1988), or the interaction of these modifications with legislative policy, *see State v. Wiegmann*, 350 Md. 585, 606–07, 714 A.2d 841 (1998); *Telnikoff v. Matusevitch*, 347 Md. 561, 580, 702 A.2d 230 (1997); *Medical Waste Assocs., Inc. v. Maryland Waste Coalition, Inc.*, 327 Md. 596, 623, 612 A.2d 241 (1992); *Gaver*, 316 Md. at 35–36, 557 A.2d 210 (Adkins, J., dissenting); *Ireland*, 310 Md. at 331–32, 529 A.2d 365. Two cases have discussed *Kelley*'s holding on the subject of abnormally dangerous activities. *See Rosenblatt v. Exxon Co. U.S.A.*, 335 Md. 58, 71–74, 642 A.2d 180 (1994); *Washington Suburban Sanitary Comm'n v. CAE–Link Corp.*, 330 Md. 115, 141 n. 14, 622 A.2d 745 (1993).

a safety device...." *Id.* at 86, 536 A.2d 699. We followed the *Kelley* malfunction requirement in the end, however, finding that the conveyer had malfunctioned before applying the risk-utility test. *Id.* We also applied the risk-utility test to find a product defective in *Ziegler v. Kawasaki Heavy Industries,* 74 Md.App. 613, 539 A.2d 701 (1988), limiting the *Kelley* malfunction requirement to "the narrow context of handguns" or possibly of other products whose "normal function ... [is] to bring about serious injury." *Id.* at 622–23, 539 A.2d 701. We stated, however, that "the *absence* of a safety device may clearly be a design defect, even in a product which does not 'malfunction.'" *Id.* at 623, 539 A.2d 701.

This statement in *Ziegler* gave rise to a line of cases, each applying the risk-utility test to a product which had not malfunctioned but which allegedly had the design defect of failing to include a safety device. *See Klein,* 92 Md.App. at 486, 608 A.2d 1276 (1992); *Nicholson v. Yamaha Motor Co.,* 80 Md.App. 695, 717–19, 566 A.2d 135 (1989). In one case, we extended this doctrine by applying the risk-utility test to a product whose design flaw was not the absence of a safety feature but nonetheless had "an indirect ... influence on safety ... [by] mak[ing] it less likely that the safety feature [would] be utilized." *Valk Mfg. Co. v. Rangaswamy,* 74 Md.App. 304, 317, 537 A.2d 622 (1988), *rev'd on other grounds sub nom. Montgomery County v. Valk Mfg. Co.,* 317 Md. 185, 562 A.2d 1246 (1989). Nevertheless, neither this Court nor the Court of Appeals has applied the risk-utility test to a handgun, nor has either Court questioned the holding in *Kelley* that the risk-utility test is inapplicable to a handgun that has not malfunctioned. *See Kelley,* 304 Md. at 138, 497 A.2d 1143.

### MALFUNCTION

▆ A handgun that has performed as expected cannot be said to have "malfunctioned" within the ambit of Restatement (Second) of Torts § 402A, as construed by *Kelley.* A handgun is a unique product in that "its normal function is to propel bullets with deadly force." *Kelley,* 304 Md. at 136, 497 A.2d

1143. Not every fatal accident caused by a handgun can be considered a malfunction, then, because a handgun is "dangerous[ ] by its very nature." *Id.* at 136, 497 A.2d 1143. As the *Kelley* Court stated, "In the case of a handgun which injured a person in whose direction it was fired, the product worked precisely as intended." *Id.* at 138, 497 A.2d 1143.

We discussed the concept of malfunction in *C & K Lord,* when an employee in a chicken rendering plant was injured by a conveyer. The stick with which he was cleaning the conveyer was caught in a pinch point and his arm drawn up into the belt's roller. For guidance, we looked to *Duke v. Gulf & Western Mfg.,* 660 S.W.2d 404 (Mo.App.1983), a case cited in *Kelley* as an example of a malfunctioning product. "In *Duke,* the plaintiff was operating a die-press when 'something struck him in the head and the next thing he knew, his hands were in the press.' " *C & K Lord,* 74 Md.App. at 85, 536 A.2d 699 (quoting *Duke,* 660 S.W.2d at 407). The press descended on the plaintiff's hands, causing serious injuries. We concluded that *Duke* was "extremely analogous" to the case before us and reasoned that

the subject conveyer's "normal function" is to transport feathers to cookers. The conveyer did not work "precisely as intended" when it caught Carter's hand.

*Id.* at 86, 536 A.2d 699. We held that the conveyer had malfunctioned and that the trial court "did not err in instructing the jury on the risk[-]utility test." *Id.*

The *Kelley* Court also cited *Barker v. Lull Engineering, Inc.,* 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 (1978), and *Back v. Wickes Corporation,* 375 Mass. 633, 378 N.E.2d 964 (1978), as examples of malfunctioning products. *See Kelley,* 304 Md. at 138, 497 A.2d 1143. In *Barker,* a motor home was involved in a highway accident and ran off the road. When the vehicle struck a roadside fence, it burst into flames, killing all four of its passengers. The *Back* plaintiff's injuries occurred when the construction loader he was operating became unbalanced and tipped over. As the plaintiff scurried away from the loader, he was struck by a piece of falling lumber and

seriously injured. In both cases, the injuries were caused by something other than the normal function of the product involved. The normal function of a motor home is to convey passengers along roadways. The normal function of the lift in *Back* was to remain stationary while lifting a load.

To be sure, the question is partially one of definition. The outcome of the malfunction inquiry is largely determined by how narrowly or broadly the normal function is defined. For example, had we defined the normal function of the conveyer in *C & K Lord* more broadly as "carrying objects in the direction in which the belt is moving," we would have found no malfunction. But when the product in question is a handgun, we are not left to our own devices. The Court of Appeals has already defined the normal function of a handgun—"to propel bullets with deadly force." *Kelley*, 304 Md. at 136, 497 A.2d 1143. In the case *sub judice*, the fact that the gunshot resulted in the tragic death of a young boy does not transform the propulsion of the bullet into a malfunction. Appellant would have us define the normal functions of a gun as "law enforcement, sport, and home and business protection," citing the exceptions to the crime of wearing, carrying, or transporting a firearm contained in Md.Ann.Code, art. 27, § 36B(c) (1957, 1996 Repl.Vol., 2000 Cum.Supp.). Each of these suggested functions, however, relies on the more basic function that renders a handgun useful—the propulsion of a bullet with great force. In reliance on the *Kelley* Court's definition, we conclude that the handgun in this case did not malfunction.

The strict liability concepts of Restatement (Second) of Torts § 402A were never intended to apply to instrumentalities, such as handguns, whose normal functions are to cause death or inflict serious injury. Section 402A was rooted in the ancient common law concept holding "those engaged in the business of selling food intended for human consumption ... to a high degree of responsibility for their products." Restatement § 402A cmt. b. The drafters of the Restatement followed more modern cases that "extended this special rule of

strict liability beyond the seller of food for human consumption ... to cover the sale of any product which, if it should prove to be defective, may be expected to cause physical harm to the consumer or his [or her] property." *Id.*

Because the products liability concept began with foods, many of the illustrations used in the comment to § 402A refer to products intended for human consumption. These illustrations are instructive nonetheless. For example, comment i focuses on the provision that the product must be "unreasonably dangerous to the user or consumer." The comment explains that "[t]he article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it," offering the following illustrations:

Good whiskey is not unreasonably dangerous merely because it will make some people drunk, and is especially dangerous to alcoholics; but bad whiskey, containing a dangerous amount of fusel oil, is unreasonably dangerous. Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous.

*Id.* at cmt. i. The propensity of whiskey to make one drunk and of tobacco to harm one's lungs are well known and expected; such dangers do not go "beyond that which would be contemplated by the ordinary consumer who purchases it." *Id.* In the case of a handgun, "[a] consumer would expect [it] to be dangerous, by its very nature, and to have the capacity to fire a bullet with deadly force." *Kelley,* 304 Md. at 136, 497 A.2d 1143. The danger that a handgun might injure someone through its normal operation, then, is not the type of hazard intended to be covered by Restatement § 402A. *See generally* Note: Manufacturers' Strict Liability for Injuries From a Well Made Handgun, 24 Wm. & Mary L.Rev. 467 (1983) (noting agreement among "most authorities ... that the definitions [of 'defective condition' and 'unreasonably dangerous' in § 402A] outline a liability device known as the consumer expectation test," but discussing the "novel legal theory of

risk-utility balancing" advanced by *Barker v. Lull Engineering Co.,* 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 (1978)), *cited in Kelley,* 304 Md. at 139, 497 A.2d 1143.

This conclusion is supported by the partial list of the types of products to which Restatement § 402A was intended to apply.

The rule stated in this [s]ection is not limited to the sale of food for human consumption, ... although it will obviously include them. It extends to any product sold in the condition ... in which it is expected to reach the ultimate user or consumer. Thus the rule stated applies to *an automobile, a tire, an airplane, a grinding wheel, a water heater, a gas stove, a power tool, a riveting machine, a chair, and an insecticide.*

Restatement (Second) of Torts § 402A cmt. d. The reporter also lists in his notes the "products to which liability has been extended" by case law: animal food, automobiles, tires, steering gear, airplanes, airplane instruments, grinding wheels, cinder building blocks, electric cable, insecticide sprays, herbicide, combination power tools, power golf carts, children's playground equipment, chairs, riveting machines, water heaters, and gas stoves. *Id.* at reporter's note 3. A handgun is inherently different from each of these products in that it is "dangerous[ ] by its very nature...." *Kelley,* 304 Md. at 136, 497 A.2d 1143. A handgun is designed for the sole purpose of "propel[ling] bullets with deadly force," *id.,* a purpose that has the necessary result of endangering human life. This attribute is shared by only a few manufactured products, none of which is included in the list of products to which Restatement § 402A was intended to apply.

The Court of Appeals was unequivocal in *Kelley* when it said, "We believe, however, that the risk-utility test is inapplicable to the present situation. This standard is only applied when something goes wrong with the product." As we have noted, none of the decisions which have emanated from the Court of Appeals construing *Kelley* has overturned or rejected its ultimate holding that "the risk-utility test cannot be ex-

tended to impose liability on the maker or marketer of a handgun which has not malfunctioned." Although we think it almost too elemental to mention, when there has been a clear and unambiguous pronouncement issued by the Court of Appeals, we are bound to abide by that decision.[9] We do not believe that the Court of Appeals could have spoken with any greater clarity than it did in its decision in *Kelley*. Until and unless the Court of Appeals revisits the issue, we are bound by *stare decisis*.

## MISUSE

Appellant has asserted that "the risk-utility test applies to a claim that the absence of a safety device renders a design defective." Notwithstanding that assertion, the firearm in question, more precisely, was not equipped with an "external" safety device, but did have a safety design to prevent it from discharging. The fatal event could have been prevented by the inability of the young victim to disengage the manual safety, use of the lockbox, proper storage of the weapon pursuant to the warnings provided, or proper supervision of the young child. Counsel for Garris acknowledged:

---

**9.** We have recognized in several previous decisions that adherence to the decisions of the Court of Appeals is mandatory: *Owens Corning v. Bauman*, 125 Md.App. 454, 496, 726 A.2d 745 (1999) (holding that "[a]lternatively, matters of public policy in the judicial arena are relegated to Maryland's highest court-the Court of Appeals ... [u]ntil or unless either avenue of redress available to appellant ... is pursued, it is not within our purview ... to overrule a decision of the Court of Appeals."); *Hans v. Franklin Square Hospital*, 29 Md.App. 329, 335, 347 A.2d 905 (1975) (holding "[w]hatever the merits of the application of *res ipsa loquitur* to the facts in this case, it is beyond our authority to decide contrary to clearly established law set forth by the Court of Appeals. We are bound by *stare decisis*."); and *Loyola Fed. Sav. & Loan Ass'n v. Trenchcraft, Inc.*, 17 Md.App. 646, 659, 303 A.2d 432 (1973) (holding "The fact remains, however, that such standard appears to be the law of this State, as enunciated in the decisions of the Court of Appeals discussed previously. Unless those decisions are either explained away or overruled by the Court of Appeals itself, this Court must follow what a majority of its members discern to be the precept to be drawn from them, *i.e.*, proof of fraud in a civil action, either in law or in equity, must be 'clear and convincing.' Only the Court of Appeals could disabuse of that notion.")

I'm in no way trying to excuse Mr. Garris's actions. We are not. Mr. Garris was negligent in the way he stored this gun. Mr. Garris will suffer the consequence of that negligence for the rest of his life. He knows he was responsible for the death of his son.

Although negligence of the parent may not be imputed to the child, it is relevant on the question of whether the elder Garris misused what is undeniably a dangerous instrumentality.

Thus, even were we to conclude that appellee's failure to include a child safety device on the handgun was a design defect, appellee would still be entitled to summary judgment because of his misuse of the gun. Comment h of Restatement (Second) of Torts § 402A provides:

A product is not in a defective condition when it is safe for normal handling and consumption. If the injury results from abnormal handling, as where a bottled beverage is knocked against a radiator to remove the cap, or from abnormal preparation for use, as where too much salt is added to food, or from abnormal consumption, as where a child eats too much candy and is made ill, the seller is not liable.

The misuse doctrine is based on the same principle, because if a product "is not unreasonably dangerous when used for a purpose and in a manner that is reasonably foreseeable, it simply is not defective, and the seller will not be liable." *Ellsworth*, 303 Md. at 596, 495 A.2d 348. Misuse therefore negates a design defect claim and it occurs when the product in question is used in a manner not reasonably foreseeable to the seller. *Id.* at 595–96, 495 A.2d 348; *see Simpson*, 72 Md.App. at 206, 527 A.2d 1337. The "foreseeability" test, however, must be applied with caution

because, with the benefit of hindsight, any accident could be foreseeable. Without care, the imposition of strict products liability could result in a manufacturer's becoming an insurer for every injury that may result from its product.

*Simpson,* 72 Md.App. at 206, 527 A.2d 1337 (citing *Phipps v. General Motors Corp.,* 278 Md. 337, 351–52, 363 A.2d 955 (1976)).

In *Simpson,* we examined whether a gasoline container was misused. The purchasers of the container stored it in the basement of their home, where they allowed two four-year-old children to play unsupervised. The children removed the cap from the container and spilled or poured gasoline onto the basement floor. When the resulting gasoline vapors ignited, one of the children died and the other was severely burned. The gasoline container had warnings written on two of its four sides reading "Keep Out of Reach of Children" and "Do Not Store in Vehicle or Living Space." *Id.* at 207, 527 A.2d 1337. With respect to the issue of misuse, we said in *Simpson, id.* at 205–06, 527 A.2d 1337:

> In *Ellsworth,* the plaintiff was severely burned when the flannelette nightgown she was wearing ignited after she came in close proximity to a front burner on the electric stove in her kitchen. The plaintiff sued the seller and manufacturer of the nightgown on three grounds: strict liability, negligence, and breach of implied warranty of fitness. The verdicts were for the defense and the plaintiff appealed, claiming the trial court gave erroneous jury instructions on misuse of a product as a defense to the strict liability claim. The Court of Appeals eventually reversed the trial court, stating that there was insufficient evidence of misuse to generate an issue for the jury to consider but not before thoroughly discussing misuse and other defenses to strict liability.
>
> The Court pointed out that problems arise in understanding the issue of misuse because of
>
>> the absence of agreement as to the meaning of the word. Misuse has been defined as: a use not reasonably foreseeable ... a use of the product in a manner which defendant could not reasonably foresee ... a use of a product where it is handled in a way which the manufacturer could not have reasonably foreseen or expected in the normal and intended use of the product and the plaintiff

could foresee an injury as the result of the unintended use ... a use or handling so unusual that the average consumer could not reasonably expect the product to be designed and manufactured to withstand it-a use which the seller, therefore, need not anticipate and provide for ... use of the product which constitutes wilful or reckless misconduct or an invitation of injury. (Citations omitted.)

*Ellsworth,* 303 Md. at 594–595, 495 A.2d 348. The Court concluded that "reasonable foreseeability" was the appropriate test. "[T]hus a seller is required to provide a product that is not unreasonably dangerous when used for a purpose and in a manner that is reasonably foreseeable.... [I]f the product is not unreasonably dangerous when used for a purpose and in a manner that is reasonably foreseeable, it simply is not defective, and the seller will not be liable." *Ellsworth,* 303 Md. at 596, 495 A.2d 348.

We ultimately held:

In this case, the [purchasers] stored the gasoline can in the basement of their home, ignoring the admonitions on the sides of the can not to store it in living areas. The [purchasers] stored the can in an area which allowed two unsupervised four-year-olds access to the can. The gasoline can was not being used for the purpose and in a manner that was reasonably foreseeable.

*Id.* at 206, 527 A.2d 1337. We held the storage of the container in the basement to be misuse as a matter of law, thus defeating the element of defect. *Id.*[10]

---

**10.** We alternatively based our decision on Restatement § 402A comment j, which provides that, when an adequate warning is given, no products liability action will lie if the product was safe for use in accordance with the warning. *Id.* at 206–07, 527 A.2d 1337. Although the parties have briefed this issue extensively, we do not address it because the trial court's grant of summary judgment was not based thereon. *See Warner v. German,* 100 Md.App. 512, 518, 642 A.2d 239 (1994). We also do not discuss *Klein v. Sears, Roebuck & Co.,* 92 Md.App. 477, 608 A.2d 1276 (1992), which was based squarely on that same legal principle. *Id.* at 488, 608 A.2d 1276.

The United States Court of Appeals for the Fourth Circuit recently applied Maryland's misuse doctrine in *Hood v. Ryobi America Corporation,* 181 F.3d 608 (4th Cir.1999). There, the miter saw that the plaintiff was using had two blade guards shielding the saw blade. *Id.* at 609. Despite clear warnings both in the owner's manual and on the saw itself, the plaintiff removed the blade guards and continued to use the saw. About twenty minutes later, "the spinning saw blade flew off the saw" and seriously injured the plaintiff. *Id.* at 610. The trial court granted summary judgment as to his defective design claim and the Fourth Circuit affirmed that judgment.

The *Hood* court stated that "Maryland law imposes no duty to predict that a consumer will violate clear, easily understandable safety warnings...." *Id.* at 612. It distinguished between warnings, such as those in *Simpson,* that guard against "affirmative consumer misuse," and those that are "aimed simply at avoiding consumer carelessness," noting that the latter should not be–and in Maryland have not been– sufficient to defeat a defective design claim. *Id.* at 612 (citing *Klein,* 92 Md.App. at 490–91, 608 A.2d 1276). The court found that the plaintiff's affirmative misuse of the product "in violation of clear, unmistakable, and easy-to-follow warnings" caused his injuries, and that this misuse "defeats any claim that the saw is defective in design." *Id.* at 613.

In the present case, the instruction manual provided by appellee stated, in relevant part, "Firearms should always be stored securely and unloaded, away from children and careless adults" and "Firearms should be securely locked in racks or cabinets when not in use." [11] These warnings were not generalized, but were "clear, unmistakable, and easy-to-follow." [12]

---

**11.** There was also an instruction on the handgun itself to read the manual before using it and general warnings throughout the manual to use the handgun safely and to read the manual thoroughly.

**12.** Appellant argues that the warnings were defective because they "do not inform a consumer of the specific danger at issue here—the fact that young children are attracted to guns and can fire them, even at very young ages." An effective warning, however, need only warn the

*Id.* at 612. Moreover, had they been followed, the tragic accident in this case would not have occurred. *See Mazda Motor of America, Inc. v. Rogowski,* 105 Md.App. 318, 331 n. 2, 659 A.2d 391 (1995) ("Warnings given to consumers are effective when the consumer is informed of a way in which the product can be used that nullifies or mitigates the risk."). Instead, however, Garris stored the handgun under his mattress, evidently within reach of his son. There can be no debate that this was an affirmative action on Garris's part that clearly contravened the warnings contained in the instruction manual. Garris's improper storage of the handgun was misuse, thus defeating appellant's defective design claim.

Appellant contends that storing the handgun under the mattress was not misuse because it was reasonably foreseeable, pointing out that "study after study has demonstrated that a significant proportion of gun owners do not lock up their guns ..., even when children are in the household." As noted above, however, these studies were not properly before the court on summary judgment. Moreover, as the Fourth Circuit stated in *Hood,* "Maryland imposes no duty to predict that a consumer will violate clear, easily understandable safety warnings...." *Id.* at 611. The presence of the warnings transforms the foreseeability inquiry; the proper question is, could appellee have reasonably foreseen that Garris would not use the lockbox provided or that he would commit acts in violation of the law or ignore clear warnings and instructions provided when he purchased the firearm? *See id.* In this case, we conclude as a matter of law that this behavior was not reasonably foreseeable.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**

---

user not to engage in the dangerous behavior; it need not inform the user of the consequences that may result from that behavior. *See Hood,* 181 F.3d at 611 (finding that a specific warning that removing the blade guards would lead to blade detachment was unnecessary).

Dissenting opinion by SONNER, Judge, in which HOLLANDER, J., joins.

Because I understand the majority's opinion to create a "gun exception" to Maryland strict products liability law, I respectfully dissent. The majority's opinion affirms the circuit court's decision to apply the *consumer expectation test,* and reject the *risk-utility test,* as the standard to determine whether the P89 pistol was defectively designed because of its failure to include a safety device. I believe the application of the consumer expectation test is flawed because it fails to recognize the evolution of the law from 1985, when the Court of Appeals decided *Kelley v. R.G. Industries, Inc.,* 304 Md. 124, 497 A.2d 1143 (1985), to the present. The application of *current* Maryland strict products liability law reveals that the circuit court applied the incorrect standard to determine defective product design.

Maryland courts have applied the consumer expectation test in all strict products liability design defect claims, unless the product either malfunctions or the alleged design defect is a failure to include a safety device. Under those two very particular circumstances, a plaintiff is entitled to the application of the risk-utility test. The genesis of this rule can be traced to *Phipps v. General Motors Corp.,* 278 Md. 337, 363 A.2d 955 (1976), when the Court of Appeals adopted § 402A of the Restatement (Second) of Torts (1965), and the consumer expectation test standard. The *Phipps* Court, however, stated that "in some circumstances the question of whether a particular design is defective may depend upon a balancing of the utility of the design and other factors against the magnitude of the risk." *Phipps,* 278 Md. at 348, 363 A.2d 955. Although the *Phipps* Court gave no examples of the "some circumstances" when the risk-utility test is applicable, the Court of Appeals in *Kelley* did. The *Kelley* Court announced that the risk utility test

is inapplicable to the present situation. This standard is only applied when something goes wrong with the product. In *Barker* [*v. Lull Eng. Co., Inc.,* 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 (1978) ], an unbalanced machine

tipped over. In *Back v. Wickes Corp.* [375 Mass. 633, 378 N.E.2d 964 (Mass.1978)], a motor home exploded, and in *Duke v. Gulf & Western Mfg. Co.* [660 S.W.2d 404 (Mo.App. 1983)], a power press caught the plaintiff's hands. These products malfunctioned.

*Kelley,* 304 Md. at 138, 497 A.2d 1143. Thus, after *Kelley,* the Maryland test for determining whether a product was defectively designed was the consumer expectation test, *unless the product malfunctioned.* The majority opinion in the instant case begins and ends its analysis of appellant's claim at this point. The majority's opinion entirely overlooks the last sixteen years of strict products liability law.

Since the Court of Appeals decided *Kelley* and announced the first exception to the consumer expectation test, three noteworthy trends continue to question our defective product design standard. First, because of the continued legal criticism of the consumer expectation test, at least twenty-four states have adopted some form of the risk-utility test for determining strict products liability design defects. *See* John F. Vargo, *The Emperor's New Clothes: The American Law Institute Adorns a "New Cloth" for Section 402A Products Liability Design Defects—A Survey of the States Reveals a Different Weave,* 26 U. Mem.L.Rev. 493 (1996). Second, the Restatement (Third) of Torts rejects the consumer expectation test as an independent standard for judging defectiveness of product designs. Restatement (Third) of Torts: Products Liability, § 2, cmt. g (1998). Third, and most important, this Court, beginning in 1985, began to expand the "some circumstances" of *Phipps* to include, in addition to malfunction, *the absence of a safety device,* the very same claim made by appellant. *See Troja v. Black & Decker Mfg. Co.,* 62 Md.App. 101, 107, 488 A.2d 516, *cert. denied,* 303 Md. 471, 494 A.2d 939 (1985); *C & K Lord, Inc. v. Carter,* 74 Md.App. 68, 86, 536 A.2d 699 (1988); *Valk Mfg. Co. v. Rangaswamy,* 74 Md.App. 304, 313, 537 A.2d 622 (1988), *rev'd on other grounds, Montgomery County v. Valk Mfg. Co.,* 317 Md. 185, 562 A.2d 1246 (1989); *Ziegler v. Kawasaki Heavy· Indus., Ltd.,* 74 Md.App. 613, 623, 539 A.2d 701, *cert. denied,* 313 Md. 32, 542 A.2d 858

(1988); *Klein v. Sears, Roebuck and Co.*, 92 Md.App. 477, 486, 608 A.2d 1276, *cert. denied* 328 Md. 447, 614 A.2d 973 (1992).

Appellant's claim is distinguishable from *Kelley* because, although the products are similar, the claim is different. The majority's opinion creates a "gun exception" to the line of cases, *decided after Kelley*, that created the second exception to the consumer expectation test. The majority apparently justifies this "gun exception" because of the overtly dangerous propensities of a handgun. I cannot subscribe to a strict products liability formula that assigns the least liability to the manufacturers of the most dangerous products. The majority's opinion freezes the technological advancements of handgun safety devices at 1985 levels. Handgun users and their children should not be deprived of the same standards of quality and safety afforded to users of *every other product*, because of this Court's reluctance to hold the appellee liable for the P89 pistol it placed within the stream of commerce.

Furthermore, the majority's opinion unjustifiably removes from the trier of fact (1) the question of whether, under the risk-utility test, the incorporation of a safety device into the P89 pistol is a workable design option, (2) whether the storing of the P89 pistol under a mattress is reasonably foreseeable and therefore not a misuse of the product, and (3) whether the warnings or instructions provided by the appellees sufficiently warned against the reasonably foreseeable, yet unintended or incorrect use of the product. As the Court of Appeals stated in *Fenwick Motor Co., Inc. v. Fenwick*, 258 Md. 134, 138, 265 A.2d 256 (1970), "[e]ven where the underlying facts are undisputed, if those facts are susceptible to more than one permissible inference, the choice between those inferences should not be made as a matter of law, but should be submitted to the trier of fact." The balancing of the risk-utility test and the question of product misuse as an intervening and superseding cause should be determined by the trier of fact. I believe the proper disposition of the instant case should have been to vacate the judgment of the circuit court and remand the case for further proceedings.